RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0181p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

JAMES A. LOCKETT,

    *Plaintiff-Appellant,*

  *v.*

JOSEPH SUARDINI, HARRY IRVINE, NANCY
BLACKFORD, and MARYROSE GALLOWAY,

    *Defendants-Appellees.*

No. 06-2392

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 05-00187—R. Allan Edgar, District Judge.

Argued: March 14, 2008

Decided and Filed: May 14, 2008

Before: MOORE, GILMAN, and SUTTON, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Kari L. Low, DICKINSON WRIGHT, Bloomfield Hills, Michigan, for Appellant.
Linda Olivieri, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.
**ON BRIEF:** Kari L. Low, DICKINSON WRIGHT, Bloomfield Hills, Michigan, for Appellant.
Linda Olivieri, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellees.
James A. Lockett, Marquette, Michigan, pro se.

  GILMAN, J., delivered the opinion of the court, in which SUTTON, J., joined. MOORE,
J. (pp. 11-12), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

  RONALD LEE GILMAN, Circuit Judge. James A. Lockett, a prisoner at the Alger
Maximum Correctional Facility in Michigan, is serving a sentence of 7 to 15 years for assault.
During a misconduct hearing at the prison, Lockett became angry and used crude language to insult
the hearing officer. He claims that two prison guards responded by forcibly removing him from the
hearing room and assaulting him, thereby causing him to suffer minor cuts and lacerations. He
further alleges that two prison nurses refused to treat his injuries.

  Lockett subsequently filed a pro se complaint pursuant to 42 U.S.C. § 1983 against the two
prison guards and the two nurses employed by the Michigan Department of Corrections (MDOC),

alleging that his First Amendment right of free speech was violated when the prison guards attacked him and the nurses denied him medical treatment in retaliation for insulting the hearing officer. He also claims that his Eighth Amendment right to be free from cruel and unusual punishment was violated by the prison guards, who allegedly used excessive force against him, and by the nurses, who purportedly denied him medical treatment for his injuries. The prison guards, on the other hand, contend that Lockett became belligerent and threatening upon leaving the hearing and that they used reasonable force to control him. Furthermore, Lockett's medical records showed that one of the nurse-defendants was never contacted to see him following the incident. The other nurse, who saw him twice within 24 hours of the incident, attested that she did not observe any injuries, nor did he tell her of any.

For the reasons set forth below, we **AFFIRM** the judgment of the district court, which granted summary judgment in favor of all the defendants.

## I. BACKGROUND

### A.      Factual background

On July 21, 2004, Lockett attended a prison administrative hearing to face charges of misconduct that had been filed against him by a prison officer. The nature of that misconduct is not described in the record and is not relevant to this appeal. During the hearing, Lockett became angry with Hearing Officer L. Maki. Lockett stated in his affidavit that his anger was "not due to the misconduct report against [him]," which he considered to be false, but because he believed that Maki had "conspired with various staff officers in regards to the misconduct report," was "in cahoots" with the prison officer who had filed the misconduct charges, and ran a "kangaroo court." "I felt a need to tell this hearings officer exact[ly] how I felt, and I called this hearings officer 'a foul and corrupted bitch,' expressing (verbally) the way I felt towards this H.O." In his complaint, he explained, "I just wanted Hearing Officer L. Maki . . . to know how I felt[]." Maki immediately terminated the hearing and instructed the guards to take Lockett back to his cell. The parties do not dispute the foregoing facts, but tell differing stories about what happened next.

Lockett claims that Joseph Suardini, one of the two prison guards (known as resident unit officers, or RUOs) who had accompanied him to the hearing, responded to Lockett's comment by forcing Lockett out of his chair, shoving him out of the hearing room, and attempting to throw him head first down a flight of stairs. Suardini did not succeed in throwing him down the stairs, Lockett contends, only because the second RUO, Harry Irvine, was holding onto the restraint straps attached to Lockett's handcuffs. According to Lockett, Suardini then assaulted him by trying to push Lockett's head into a wall, attempting to choke him, and grabbing Lockett by the throat, all of which caused Lockett to suffer what he described as "minor lacerations and cuts." Lockett admits that he then bit Suardini's hand, but claims that he did so only in self-defense. RUO Irvine allegedly joined in the assault by bending back Lockett's first two fingers, which Lockett believed was an attempt to break them. Lockett claims that the assault continued as Irvine and Suardini took him back to his cell, where he says that he was placed in soft restraints.

Robert Palmer, a fellow inmate, submitted an affidavit stating that he witnessed the altercation outside of the hearing room while cleaning a nearby common area. He attests that he observed Suardini and Irvine escorting Lockett from the disciplinary hearing, and that he saw Suardini grab Lockett's jaw and face, "pull" Lockett down the stairs, and "slam" Lockett into the wall. Palmer also states that Irvine was pulling Lockett's handcuff strap "using Extreme Force," and that "[a]t NO TIME prior to this altercation had resident Lockett . . . made any aggressive motions toward staff."

Irvine and Suardini tell a substantially different version of the altercation. They contend that, as they removed Lockett from the hearing room following his comment to Maki, Lockett lunged toward Maki. This caused Suardini to grab Lockett's restraints. Suardini and Irvine further claim that, upon leaving the hearing room, Lockett became disruptive and yelled at Suardini: "If I could get these cuffs off I'd kill you." Lockett's complaint and affidavit do not address whether he made such a threat, although he denies that he had lunged toward Maki. The officers also assert that, as they escorted Lockett down a flight of stairs toward his cell, Lockett kicked Suardini, tried to break free, and got a hold of and twisted Suardini's fingers. Suardini's affidavit states that he tried to restrain Lockett by putting his arm around Lockett and wrestling Lockett to the floor until additional help arrived.

The incident reports filed by Irvine and Suardini further recount that they, with help from other officers, restrained Lockett against a wall and that Lockett fell to the floor in the process. At that point, Lockett bit Suardini's hand and continued to struggle against the officers. Irvine, Suardini, and the other officers finally returned Lockett to his cell, where they say that Lockett refused to let them remove his restraints. Suardini denies that he assaulted and tried to choke Lockett. He also claims that he and Irvine were taken to a hospital to receive treatment for unspecified injuries that they sustained in the altercation. The incident reports and affidavits filed by Irvine and Suardini are consistent with each other and with the statements filed by other prison officers who witnessed the altercation and assisted in restraining Lockett.

Lockett asserted in his complaint that the assault caused "open wounds" on both of his hands, his forehead, and knee, and that these injuries caused him "extreme pain." But in his affidavit responding to MDOC's motion for summary judgment, Lockett described these injuries as "minor lacerations and cuts on his forehead, left knee and both wrists, with dryed-up [sic] blood." Palmer's affidavit makes no mention of Lockett's injuries.

The parties also tell different stories regarding whether Lockett was denied medical treatment for the injuries he sustained in the above-described incident. Lockett asserts in his complaint that, following the alleged assault, he informed Nurse Nancy Blackford of his injuries. He claims that Blackford refused to treat him. The next day, he purportedly showed his injuries to a second nurse, Maryrose Galloway, who he alleges also refused to treat him. Palmer's affidavit does not make reference to any treatment that Lockett may or may not have received for his purported injuries.

Blackford, however, submitted an affidavit stating that, following the July 21, 2004 incident, she did not receive a call for medical assistance for Lockett and that she had no contact with him. Her later review of Lockett's medical chart showed that his restraints were checked four times—two of which were by Galloway—in the 24 hours following the incident, and that no complaints of injuries or pain were recorded. He was also scheduled to be seen by a nurse on July 26, 2004, but for some unknown reason he did not keep the appointment. Lockett's medical records also revealed that he complained of numbness and tingling in his right and left thumbs on August 6, 2004, but that a subsequent x-ray was negative for both dislocation and fracture.

Blackford's account is consistent with the affidavit of Galloway, who first checked Lockett's restraints just before midnight on July 21, 2004. Lockett was standing at his cell door and immediately began raising his voice as she approached him, complaining about his medications and his inability to get his T-shirt off, which he had pulled over his head and down to his forearms. He was apparently unable to remove the T-shirt completely because of his restraints. She observed that it "would be seemingly impossible for Lockett to have gotten his T-shirt off as far as he had with the 'injuries' he was claiming." Galloway then gave Lockett his medications. But she "observed no signs of injury, much less . . . the injuries Lockett is claiming, and he made no mention of anything regarding [a] staff assault or injuries." Galloway checked Lockett's restraints again early the next morning. According to Galloway's affidavit, he was "laying on his bunk facing the wall

in no distress. Lockett looked at me when I asked him if he was okay, stated 'no' in a sarcastic tone, then turned his back to me and would not answer any further. He was in no distress at that time."

Lockett was subsequently charged with assault as a result of the July 21, 2004 incident. An administrative hearing on the charge was held in early August of 2004. According to the hearing officer's report, Lockett refused to attend and the hearing was held without him. The hearing officer viewed a surveillance video that captured the altercation outside of the hearing room and described what he saw: "At the top of the stairs, one officer is seen contorting his body as he goes down steps. There appears to be a scuffle at the bottom of the stairs and the prisoner is taken back across the hall to his cell." The hearing officer concluded, based on the incident report, Irvine's and Suardini's statements, and the video, that Lockett was guilty of assault. He found that

> [t]he prisoner became disruptive as he was being escorted; the officer would not be moving and trying to control the prisoner's movements unless [Lockett] had moved first. Then, at the bottom of the stairs there appears to have been a struggle between the two officers and this prisoner. The movements of staff are consistent with being kicked or bitten. I find that the prisoner made non consensual contact with the officer. The comments to [the officer]—that [Lockett] would kill the officer—are consistent with the fact that [Lockett] deliberately and intentionally kicked and bit [the officer].

Lockett's punishment was 30 days of lost privileges. In addition, Lockett acknowledges that he lost good-time credits for the month following his disciplinary conviction for the assault, as mandated by Michigan law. *See* Mich. Comp. Laws § 800.33(6).

## B.    Procedural background

On July 22, 2004, one day after the incident, Lockett filed a grievance against Nurses Blackford and Galloway for refusing to treat his injuries and deliberately causing him additional pain and suffering. He also filed a separate grievance against RUOs Irvine and Suardini for assault, battery, and cruel and unusual punishment. The resolution of those grievances is unclear from the record, but MDOC does not argue that Lockett has failed to exhaust his administrative remedies. Lockett then filed a pro se complaint pursuant to 42 U.S.C. § 1983 against Blackford, Galloway, Irvine, and Suardini in the district court in early August of 2005. In it, he alleged that the defendants had violated (1) his First Amendment rights by attacking him and denying him medical treatment in retaliation for his comment to Hearing Officer Maki, (2) his Eighth Amendment right to be free of excessive force when restraining him, and (3) his Eighth Amendment right to be free from cruel and unusual punishment by denying him medical treatment. MDOC, on behalf of the individual defendants, subsequently filed a motion for summary judgment, to which Lockett responded (without supporting documentation) by repeating the allegations contained in his complaint and disputing MDOC's version of events.

The magistrate judge assigned to the case issued a Report and Recommendation (R&R) granting MDOC's motion, finding that (1) Lockett's § 1983 action was barred pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), because his allegations necessarily implied the invalidity of his disciplinary conviction for the July 21, 2004 assault, (2) RUOs Irvine and Suardini did not violate Lockett's Eighth Amendment rights because they used a reasonable, rather than an excessive, amount of force to control Lockett, (3) Nurses Blackford and Galloway did not violate his Eighth Amendment rights in failing to treat his injuries because Lockett failed to show the existence of a serious medical need, (4) Lockett's First Amendment claim failed because his comment to the hearing officer was not protected speech, and (5) the individual defendants were entitled to qualified immunity because Lockett failed to show that they violated any of his constitutional rights. Lockett responded to the R&R by filing his own affidavit and that of Robert Palmer.

Twenty days later, the district court adopted the R&R over Lockett's objections. Lockett has timely appealed with the assistance of counsel.

## II. ANALYSIS

### A.    Standard of review

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    Applicability of *Heck*'s favorable-termination bar to Lockett's § 1983 claims

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." 42 U.S.C. § 1983. The Supreme Court, however, has limited the availability of § 1983 actions for prisoners in a series of cases, the most pertinent of which is *Heck v. Humphrey*, 512 U.S. 477 (1994). Our court recently explained the bar that *Heck* places on § 1983 suits brought by prisoners:

> Federal courts have long recognized the potential for prisoners to evade the habeas exhaustion requirements by challenging the duration of their confinement under 42 U.S.C. § 1983, rather than by filing habeas petitions. Consequently, the Supreme Court recognized a "habeas exception" to § 1983 in *Preiser v. Rodriguez*, 411 U.S. 475, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973), when it held that suits challenging the fact or duration of confinement fall within the traditional scope of habeas corpus and accordingly are not cognizable under § 1983. The Court expanded the habeas exception to § 1983 in *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994), and *Edwards v. Balisok*, 520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997). In *Heck*, the Court determined that, unless a prisoner's conviction or sentence were previously set aside by a separate legal or administrative action, § 1983 would not countenance claims for damages if a finding for the plaintiff would *necessarily invalidate* a conviction or sentence. And in *Balisok*, the Court concluded that a prisoner cannot use § 1983 to challenge prison procedures employed to deprive him of good-time credits when the . . . procedural defect alleged would, if established, "necessarily imply the invalidity of the punishment imposed." 520 U.S. at 648, 117 S. Ct. at 1584.

*Thomas v. Eby*, 481 F.3d 434, 438 (6th Cir. 2007) (emphasis in original).

MDOC initially argued that *Heck* bars both Lockett's First Amendment free-speech claim and his Eighth Amendment excessive-force claim, but later conceded at oral argument that his Eighth Amendment excessive-force claim is *not* barred by *Heck* because Lockett's disruptive and threatening behavior upon leaving the hearing room would not justify the allegedly excessive force that Lockett was subjected to, even if Lockett was in fact guilty of assault. *See Huey v. Stine*, 230 F.3d 226, 230 (6th Cir. 2000) ("In general, the federal courts hold that Eighth Amendment claims do not run afoul of *Heck* because the question of the degree of force used by a police or corrections officer is analytically distinct from the question whether the plaintiff violated the law." (citing *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir.1997) (noting that "it is possible for a

finding that [the defendant] was resisting arrest to coexist with a finding that the police used excessive force to subdue him")))), *abrogated on other grounds by Muhammad v. Close*, 540 U.S. 749 (2000). The same reasoning applies to Lockett's claim that the nurses were deliberately indifferent to his injuries. That claim could hypothetically succeed, regardless of whether the nurses knew of the altercation or Lockett's comment to the hearing officer, and notwithstanding Lockett's actual guilt in assaulting the RUOs.

Thus the only remaining question under *Heck* is whether Lockett's First Amendment claim necessarily implies the invalidity of his misconduct conviction for assault. Lockett challenges MDOC's contention that his claims are barred by *Heck* and, alternatively, argues that, if *Heck* applies to any of his claims, this court should nevertheless allow those claims to go forward under an exception to *Heck* that was articulated by the Second Circuit in *Peralta v. Vasquez*, 467 F.3d 98, 105-06 (2d Cir. 2006) (holding that, if a prisoner "both agrees to and can successfully abandon once and for all" a claim challenging the duration of his sentence as a precondition to maintaining his § 1983 claim—so that "his success in the § 1983 action would have *no* effect on the sanctions that relate to the length of time he served in prison"—then the concern underlying *Heck* would not apply and the claim would not be barred (emphasis in original)).

A successful § 1983 action on Lockett's First Amendment claim would mean that his comment to the hearing officer was protected speech and that the defendants had retaliated against him for engaging in such speech. But such a finding would not necessarily imply the invalidity of Lockett's misconduct conviction for assault because Lockett could have unlawfully assaulted the officers in the course of the altercation by using force beyond that necessary to defend himself, even if the incident was precipitated by the officers' own retaliatory conduct. "Where there is room for the facts alleged by the plaintiff and the facts essential to the judgment of the state agency to peacefully co-exist, the § 1983 must be allowed to go forward." *Woods v. Lozer*, No. 3:05-1080, 2006 U.S. Dist. LEXIS 83785, at *30-31 (M.D. Tenn. Nov. 9, 2006) (citing *Heck*, 512 U.S. at 487). Accordingly, we conclude that Lockett's First Amendment retaliation claim is analytically distinct from whether he was guilty of assault and therefore does not implicate *Heck*. And because of our determination that none of Lockett's claims are barred by *Heck*, we need not address his argument that this court should recognize the *Peralta* exception to *Heck*'s favorable-termination bar.

## C. The merits of Lockett's First Amendment claims

A prisoner alleging retaliation for the exercise of a constitutional right must show that

(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). Lockett admits that he called Hearing Officer Maki a "foul and corrupted bitch." The threshold question is therefore whether that comment was "protected conduct" under the first prong of the *Thaddeus-X* test.

MDOC contends that Lockett's comment was not protected because it constituted "insolent" behavior in violation of MDOC's disciplinary regulations. Lockett did not respond to this argument, asserting instead that his speech was protected under the public-concern test. MDOC correctly notes that whether the public-concern test determines the protection to be afforded a prisoner's speech is an open question in the Sixth Circuit. In *Thaddeus-X*, this court sitting en banc specifically refused to make a "determination about the appropriateness of explicitly applying the public-concern limitation to speech by prisoners." *Id.* at 392. Nor do we need to decide that issue here, because the

court held in *Thaddeus-X* that "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one" of the three-step retaliation analysis. *Id*. at 394; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) (holding that a prison regulation that "impinges on inmates' constitutional rights" is nevertheless valid if that regulation "is reasonably related to legitimate penological interests").

MDOC Policy Directive No. 03.03.105 provides that "insolent" behavior is a "major misconduct" violation. Mich. Dep't of Corr. Pol'y Directive No. 03.03.105B, Attachment B: Major Misconducts, at 3, http://www.michigan.gov/corrections (follow the "Publications and Information" link, then follow the "Policy Directives" link) (Jan. 1, 2007); *see also Scott v. Churchill*, 377 F.3d 565, 567-68 (6th Cir. 2004) (analyzing the § 1983 claim of a Michigan state prisoner against whom a prison officer filed an allegedly false major misconduct charge for "insolent" behavior); *Denham v. Shroad*, 56 F. App'x 692, 693 (6th Cir. 2003) (addressing the § 1983 claim of a Michigan state prisoner who was convicted of major misconduct for, among other things, "insolent" behavior). Such behavior is defined as "[w]ords, actions, or other behavior which is intended to harass, degrade, or cause alarm in an employee." Mich. Dep't of Corr. Pol'y Directive No. 03.03.105B, Attachment B: Major Misconducts, at 3. Lockett's comment that the hearing officer was "a foul and corrupted bitch" was insulting, derogatory, and questioned her authority as well as the integrity of the proceeding. It thus falls well within the definition of "insolence" under the MDOC Policy Directive. Accordingly, Lockett's First Amendment claim fails as a matter of law because his comment to the hearing officer was not protected conduct under *Thaddeus-X*.

## D.     The merits of Lockett's Eighth Amendment claims

### 1.     *Excessive force*

Lockett next argues that RUOs Irvine and Suardini used excessive force, in violation of the Eighth Amendment, when they restrained him following his July 21, 2004 hearing. MDOC does not dispute that the RUOs used force against Lockett, but instead challenges Lockett's claim that the force used was excessive. The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain," including inflictions of pain that "are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (citations and internal quotation marks omitted). This court has held that "in the prison context, good faith use of physical force may be necessary to maintain prison security and discipline." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992). The Supreme Court has explained that

> [w]here a prison security measure is undertaken to resolve a disturbance . . . that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (internal quotation marks omitted).

Furthermore, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary in a particular situation, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Hudson v. McMillan*, 503 U.S. 1, 7, 10 (1992) (holding that the extent of the defendant's injuries, including bruises, swelling, loosened teeth, and a cracked dental plate, were sufficiently serious for his § 1983 claim to survive a motion to dismiss (quoting *Whitley*, 475 U.S. at 321)). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that

the use of force is not of a sort repugnant to the conscience of mankind." *Id*. at 9-10 (citations and internal quotation marks omitted).

An "absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id* at 7. This analysis "must be carefully circumscribed to take into account the nature of the prison setting in which the conduct occurs and to prevent a prison official's conduct from being subjected to unreasonable *post hoc* judicial second-guessing." *Parrish v. Johnson*, 800 F.2d 600, 605 (6th Cir. 1986); *see also Williams*, 981 F.2d at 906 ("[A]ll the facts and circumstances surrounding the application of force must be scrutinized and weighed.").

Lockett does not dispute that he insulted the hearing officer, became "very angered and upset" during the hearing, bit RUO Suardini's hand while being escorted back to his cell, and resisted the RUOs in response to their allegedly excessive use of force. Nor does he challenge MDOC's contention that he verbally threatened the RUOs outside of the hearing room. Although his fellow prisoner attested that he did not see Lockett acting in an aggressive manner toward the RUOs, Lockett's undisputed conduct alone provided the RUOs with a good faith basis for using force to control Lockett, restore discipline and order, and transport him back to his cell. *See Williams*, 981 F.2d at 905-06.

Lockett's own assertions indicate that a minimal amount of force was applied by the RUOs. He stated that Suardini *attempted*, unsuccessfully, to throw him down the stairs and choke him, and that both RUOs *tried* to push his face into the wall. In attempting to choke him, Lockett explained that Suardini "missed my neck and throat, caught my mouth instead," at which point Lockett "bit him extremely good." The RUOs, according to Lockett, were successful only in "snatch[ing]" him out of his chair in the hearing room, "shov[ing]" him out of the hearing room, "grabb[ing]" Lockett around the left jaw and throat, and bending back two of his fingers.

The degree of force, he asserted, was great enough to "almost" break his eyeglasses. But the amount of force required to "almost" break a person's eyeglasses is minimal. Shoving, grabbing, and bending back two of Lockett's fingers also required only minimal force and was reasonably related to the need for forcibly bringing Lockett under control and returning him to his cell. This conclusion is reinforced by the fact that Lockett, by his own account, suffered at best only "minor lacerations and cuts," and that undisputed evidence showed no dislocation or fracture in his hand. *See Johnson v. Unknown Coolman*, 102 F. App'x 460, 461 (6th Cir. 2004) (denying a prisoner's excessive-force claim where the prison officers pushed him into his cell, pulled hard on his restraints, hurt his wrists, and tried to bend his thumb back, all in a "legitimate attempt to return him to his cell"); *Williams v. Johnson*, 55 F. App'x 736, 736-37 (6th Cir. 2003) (denying a prisoner's excessive-force claim where the prisoner was being argumentative and the prison officer grabbed his arm and attempted to shove him into a closed door, which was determined to be a *de minimis* use of force that was reasonably related to a security need).

Our dissenting colleague asserts that *Johnson* and *Williams* are distinguishable and that a genuine issue of material fact exists regarding the degree of force used by the RUOs. We remain persuaded, however, that these cases are on point and that the RUOs' minimal application of force, together with Lockett's admittedly minor injuries, did not rise to a level that is sufficient to sustain his Eighth Amendment claim.

### 2. *Denial of medical treatment*

Lockett's final claim is that Nurses Blackford and Galloway denied him medical treatment for his injuries, and that this denial constituted cruel and unusual punishment in violation of the Eighth Amendment. The Supreme Court has held that a denial of medical treatment violates the Eighth Amendment where two requirements are met. First, the medical need alleged must, objectively, be "sufficiently serious" that the plaintiff faces a substantial risk of harm. *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994). The second requirement is that the prison official must have a "sufficiently culpable state of mind" in denying medical treatment, which is one of deliberate indifference. *Id.* (internal quotation marks omitted).

A medical need is sufficiently serious if it is "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004) (emphasis in original) (explaining that the Sixth Circuit applies an "obviousness" standard to determine whether a medical need is "sufficiently serious" to satisfy the test set forth in *Farmer* as well as an "effect of delay in treatment" standard where the medical need is minor or nonobvious). Where the claimed injury is minor or nonobvious, "the seriousness of a prisoner's medical needs may also be decided by the effect of a delay in treatment." *Id.* (emphases and internal quotation marks omitted). "Verifying medical evidence" is required in those cases to "assess whether the delay caused a serious medical injury." *Id.* at 898. Under the deliberate indifference prong, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

### a.      *Objectively serious medical need*

According to Lockett's own affidavit, he suffered "minor lacerations and cuts" and soreness in two of the fingers on his right hand. Nurse Galloway attested that when she twice checked on him within 24 hours after the altercation, he did not display any injuries. In addition, a subsequent examination of his hand revealed no fracture or dislocation in his fingers. Lockett's affidavit, submitted after Galloway's, does not dispute the foregoing factual assertions, and he did not submit any verifying medical evidence relating to the effect of not receiving treatment.

Lockett's allegations of minor cuts and lacerations do not support his claim that his injuries were, objectively speaking, sufficiently serious to necessitate medical treatment. *See Blackmore*, 390 F.3d at 898 (citing cases involving nonobvious and minor injuries that did not support Eighth Amendment claims, including minor cuts and bruises resulting from a glass splinter that required neither stitches nor painkillers and a knee injury for which it was "merely preferable" that the prisoner receive treatment). The claimed seriousness of his injuries and any adverse effect from not receiving immediate medical attention is further undermined by the undisputed fact that Lockett failed to keep an appointment at the medical clinic five days after the incident. Thus, even accepting Lockett's own allegations of injury as true, he has failed to create a genuine issue of material fact regarding the severity of his injuries.

### b.      *Subjectively culpable state of mind*

Lockett has also failed to satisfy the second requirement for his denial-of-medical-treatment claim—deliberate indifference on the part of either Blackford or Galloway. Lockett alleged in his verified complaint that Blackford refused to treat his injuries. Blackford, however, responded by attesting that she was not aware of his injuries because she never received a call about them and that she had no contact with him at all around the time of the July 21, 2004 incident. Lockett's affidavit, submitted after Blackford's, does not respond to Blackford's assertions and in fact does not address his denial-of-medical-treatment claim at all.

For her part, Galloway stated that she saw Lockett twice within 24 hours of the incident, but observed no signs of injury. During her second visit to his cell, at 4 a.m. on the morning after the incident, she asked him if he was okay. He allegedly turned his back to her and replied "no" in a "sarcastic tone." The undisputed fact that she checked on Lockett twice, gave him his medications, and asked him if he was okay defeats Lockett's claim that she disregarded his condition or was deliberately indifferent. Viewing the evidence in the light most favorable to Lockett, Galloway's

actions could at most be characterized as negligent for failing to ask follow-up questions after he sarcastically said that he was not okay, but not as evincing deliberate indifference.

In light of the evidence in the record, no reasonable jury would find that Lockett's injuries were serious or that either nurse was deliberately indifferent to his medical needs. We therefore conclude that his Eighth Amendment claim of a denial of medical treatment is without merit.

## E.  Qualified immunity

MDOC further argues in defense of Lockett's claims that Blackford, Galloway, Irvine, and Suardini are entitled to qualified immunity. Based on our determination that none of Lockett's constitutional rights were violated, we have no need to discuss the availability of qualified immunity for the defendants in this case. *See Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (explaining that, "[i]n resolving questions of qualified immunity, courts are required to resolve a threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." (internal quotation marks omitted)).

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I write in dissent because, in contrast to the majority, I believe that a genuine issue of material fact exists regarding whether Joe Suardini ("Suardini") and Harry Irvine ("Irvine") used excessive force against James A. Lockett ("Lockett") in violation of the Eighth Amendment. I concur in the sections of the opinion upholding the district court's grant of summary judgment to the defendants on Lockett's First Amendment claim and on Lockett's claim that he was denied medical treatment in violation of the Eighth Amendment. I believe, however, that we should reverse the district court's grant of summary judgment on Lockett's excessive-force claim and remand for further proceedings.

The majority opinion fails to view the facts alleged in Lockett's complaint and in Lockett's and Palmer's affidavits in the light most favorable to Lockett. The majority first concludes that Lockett's aggressive behavior justified the use of some amount of force by Irvine and Suardini. Lockett's affidavit, however, states that while he had verbally insulted the hearing officer, he had not physically threatened her: "At no time did I '*ever attempt*' to move towards this hearings officer, being approximately six (6) to eight (8) feet away from me and my hands were cuffed behind my back." Joint Appendix ("J.A.") at 183 (Lockett Aff. at 3). Likewise, Palmer's affidavit states that, before the physical altercation between Lockett and the officers, Lockett had not "made any aggressive motions towards staff" and posed no threat to the officers because he was handcuffed. J.A. at 179 (Palmer Aff. at ¶¶ 12, 14). Whether Lockett posed a physical threat to the hearing officer, Irvine, or Suardini is critical to the inquiry "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Consequently, the significant difference between the factual accounts presented by the defendants and by Lockett creates a genuine issue of material fact regarding "'whether the use of force could plausibly have been thought necessary.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Second, the majority opinion concludes that Suardini used only minimal and not excessive force against Lockett. The majority's characterization of the force as minimal distorts Lockett's factual narrative by exaggerating the importance of the word "attempt." Lockett's affidavit alleged that Suardini "proceeded to shove (throw) [Lockett] out of the hearings office room and towards the stairs"; "attempted to '*literally*' throw [Lockett] down the flight of stairs"; "'*attempt[ed]*' to run (drag) [Lockett's] head into and alongside the wall, causing cuts and lacerations in the center of [his] forehead"; "attempted" to "choke" Lockett; and "tr[ied] to '*break*' [Lockett's] fingers." J.A. at 183-85 (Lockett Aff. at 3-5). The majority concludes that the fact that Suardini did not *succeed* in these attempts to throw Lockett down the stairs, drag his head into a wall, choke him, and break his fingers means that Suardini could not have used excessive force against Lockett. By contrast, I think these attempts themselves involved the use of force that, if the facts are viewed in the light most favorable to Lockett, meets the Supreme Court's standard for excessive force: "punishments, which although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' . . . [including] inflictions of pain . . . that are 'totally without penological justification.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976)). Lockett's verified complaint states that he "was brutally assaulted" by Irvine and Suardini, and, at the summary-judgment stage, the allegations in Lockett's affidavit should be seen as substantiating that claim. J.A. at 25 (Verified Compl. at 2). Finally, the two decisions to which the majority opinion

analyzes in support of its conclusion that Suardini did not use excessive force are unpublished and therefore nonbinding opinions that, in addition, are readily distinguishable.[1]

In conclusion, I believe that Lockett has created a genuine issue of material fact regarding whether the degree of force that Irvine and Suardini used against him exceeded that which was reasonably necessary and thus constituted a malicious effort to cause harm rather than a good-faith effort to restore discipline. I would therefore reverse the district court's grant of summary judgment to the defendants on Lockett's excessive-force claim and remand for further factfinding.

---

[1] The majority cites two unpublished Sixth Circuit decisions in support of its conclusion. *See Johnson v. Coolman*, 102 F. App'x 460, 460-61 (6th Cir.) (unpublished) (holding that the defendant security guards did not use excessive force when they "pushed [the plaintiff prisoner] into his cell, pulled hard on the security strap attached to his handcuffs, and . . . attempted to bend his thumb back"), *cert. denied*, 543 U.S. 1006 (2004); *Williams v. Johnson*, 55 F. App'x 736, 736-37 (6th Cir. 2003) (holding that the amount of force used in shoving the plaintiff prisoner into a closed door was "reasonably related" to the need for force when a food-service manager felt threatened). When we take the facts in the light most favorable to Lockett, the amount of force used against him—involving attempts to throw him down the stairs, push his head into a wall, choke him, and break his fingers—far exceeded the force at issue in these cases.