**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0045n.06

No. 09-3311

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jan 19, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| SETH BUNKE, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant. | ) | |

_____

Before: DAUGHTREY, CLAY and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant Seth Bunke appeals his conviction of depriving a prison inmate of his rights under color of law, in violation of 18 U.S.C. § 242 and 18 U.S.C. § 2. We **AFFIRM**.

## I.  BACKGROUND

This case arises from an incident in which Bunke, a corrections officer in Lucas County, Ohio, purportedly used excessive force against Jeffrey Jones, an inmate at the Lucas County jail. The incident occurred on July 11, 2007, as Jones was being relocated from one jail floor to another. As is standard procedure, Jones was taken to a multipurpose room for a strip search and cavity search. Four officers went with him: Bunke, Joel McConnell, James Kotlarcyk and Richard Elizondo.[1]

_____

[1] McConnell and Kotlarcyk were also indicted in connection with this incident; they did not testify at Bunke's trial.

To complete the cavity search, the officers ordered Jones to take off his clothes and to "squat and cough" while parting his buttocks with his hands. Jones slapped his behind with his hand and made a possibly obscene or obnoxious remark to the officers. Soon after that, officers grabbed Jones by the arms and "took him down" face first onto the floor. Elizondo, the only unindicted witness to this phase of the incident, testified that there was no reason to take Jones down.[2]

Jones landed on his stomach with his arms and hands under his chest. The officers surrounded Jones on the floor, trying to pull his arms out from under him to cuff his hands behind his back. Jones kept his hands locked under his chest, resisting attempts to be cuffed; however, he did not try to punch or hit the officers. At least two other officers, Curtis McQueary and Christopher Branch, heard a commotion and converged on the multipurpose room. At that point, Jones was surrounded by at least six male officers, two of whom sat on his legs while the other four tried to cuff his hands. Some witnesses testified that Jones tried to bite McConnell, but they did not actually see it happen and McConnell was not bitten.[3]

---

[2]Elizondo testified that Jones was angry and refused to squat and cough; instead, he slapped his derriere and asked Kotlarcyk: "You like this big boy? You like this?" Jones also called the officers names and made reference to McConnell's wife and family. Eventually, he was told to get dressed. As Jones laced his shoes, McConnell raised his leg and placed it on the inmate's shoulder; Jones did not react. At that point, McConnell and Kotlarcyk grabbed Jones and took him down.

Jones testified that he cooperated when told to squat and cough, but the officers laughed at him and made him do it over several times. He got annoyed, slapped his behind and said: "Is this what you boys want to see?" Jones heard footsteps behind him and was thrown to the floor.

[3]Elizondo testified that he heard McConnell yell that Jones was trying to bite him, but he did not see it happen. McQueary saw Jones's head "lunging" towards McConnell, but he did not actually see Jones try to bite McConnell. Branch did not hear McConnell or see Jones try to bite anyone. In sum, of the nondefendant witnesses, one heard McConnell yell, one saw Jones "lunging"

At some point during the struggle, the nondefendant witnesses saw Bunke kick Jones, but their accounts diverged as to how many kicks were given and where they landed.[4] Elizondo testified that Bunke gave Jones two "pretty hard" kicks to the right side. McQueary saw Bunke give Jones "multiple," "hard" kicks to the "head and upper face," causing Jones's head to hit the floor with a sound "like a bowling ball hitting the floor." McQueary yelled at Bunke to stop, but Bunke continued kicking. Branch testified that he saw Bunke give Jones one "hard kick" to the side and heard an officer tell him to stop. Aside from Bunke,[5] witnesses agreed that Jones posed no threat and that there was no legitimate law-enforcement reason to kick him.

Eventually, the officers were able to handcuff Jones and pick him up off the floor. Jones's right eye was bleeding and the right side of his chest was bloody; there was a pool of blood the size of a dinner plate on the floor. The emergency-room physician who treated Jones observed that his shoulder was dislocated and that he had a laceration to the forehead. Further examination revealed

at McConnell, and one did not hear or see anything.

[4]Jones testified that he was unable to tell who hit him, or whether he was kicked or kneed, because he was face down with his eyes covered. Jones made slightly different statements to an investigator a few months after the beating: at that time, Jones said that his head was slammed against the floor and that he was kneed, but he did not mention getting kicked.

[5]Bunke testified that Jones was upset with the strip search, made several graphic homosexual insinuations while squatting, and threatened to kill McConnell, his family and his children. Jones lunged at McConnell and a fight broke out. Initially, Jones fought the officers on his feet; they managed to pull him to the ground, but he landed on his back and continued to fight them. Eventually, the officers were able to flip Jones onto his stomach, but he continued wildly kicking his legs and throwing his body back and forth. At that point, Bunke heard McConnell say: "Don't you bite me," and kneed Jones to the side "maybe twice." After that, the officers were able to cuff Jones and the incident ended.

abrasions on Jones's chest, several fractured ribs and a collapsed lung, all to the right side of his body. The doctor testified that lung collapse is typically caused by a "high-energy impact or high-energy insult" consistent with an assault. After a few days, Jones developed bruising below the eyes, usually the sign of a head injury.

Immediately after the incident, Elizondo, McQueary, McConnell, Kotlarcyk and Bunke met with an officer in the fifth-floor control booth to discuss the incident. Elizondo and McQueary noticed that Bunke had blood on his steel-toed boot, which Bunke proceeded to wipe off.[6] During the meeting, Bunke turned on the prison intercom and, speaking into the microphone, announced that he "kicked an inmate's ass." Bunke also commented braggingly to the others in the control room, "I can't believe I kicked him."

A grand jury charged Bunke with depriving Jones of his rights under color of law, in violation of 18 U.S.C. §§ 242 and 2 (Count I), and conspiring to falsify documents pertaining to the investigation (Count II). Bunke was also indicted on four other deprivation-of-rights counts (IV-VII).[7] In addition, the grand jury charged McConnell and Kotlarcyk under 18 U.S.C. § 371 with conspiring to impede, obstruct and influence the investigation into Jones's assault, in violation of 18 U.S.C. § 1519 (Counts II-III). The district court granted motions to sever McConnell and

---

[6]Bunke testified that what the officers mistook for blood was actually "spaghetti sauce from the previous night."

[7]The remaining counts alleged that Bunke unlawfully arrested two civilians (Count IV) and that he assaulted three other detainees at Lucas County jail (Counts V-VII).

Kotlarcyk's charges and ordered Bunke tried first.[8]   Shortly before trial, the court granted the Government's motion to dismiss the conspiracy count against Bunke (Count II).

Before trial, Bunke moved for the court to appoint an expert witness to explain to the jury how several individuals who witness the same event can have differing views of that experience. Bunke argued that this testimony was important to establish what the witnesses may or may not have seen and whether they could identify Bunke or anyone else as the assailant.  The district court held that the expert's testimony was not necessary because the witnesses in question were co-workers of Bunke's who knew him well, they were in good positions to see the events, and there was no particular concern about their recollections.

At trial, the Government presented evidence that Lucas County corrections officers are taught to resolve dangerous situations using the least amount of force necessary.  Using a "continuum-of-force" chart, officers learn to scale their responses to the degree of threat they face.[9]  According to this chart, if an inmate pushes, or wrestles with, a corrections officer, the officer may respond *inter alia* by striking, punching or kicking the inmate.  When asked by the defense if Jones was wrestling with officers at the time of the incident, Elizondo and Branch testified that he was not.  McQueary

---

[8]After Bunke's trial, McConnell and Kotlarcyk pleaded guilty to witness tampering and the remaining charges against them were dismissed.

[9]For instance, the chart indicates that, if an inmate pulls away from an officer or refuses to move, the officer can take the inmate down, strike certain muscle groups, or employ pain techniques to obtain compliance.  However, when confronting an inmate armed with a weapon, or a weaponless inmate who threatens the officer's life, the officer may respond with deadly force.

opined that Jones's actions amounted to wrestling, but added that kicking him was not necessary under the circumstances.

The jury convicted Bunke of violating Jones's right to be free from excessive force (Count I). Bunke was also found guilty of Counts IV (unlawful arrest) and VI (assaulting a detainee), but the jury acquitted him of the other detainee-assault claims (Counts V and VII). The district court denied Bunke's motion for acquittal and sentenced him to 48 months' imprisonment on Count I and 12 months each on Counts IV and VI, to be served concurrently. Bunke appeals only his conviction on Count I.

## II.   DISCUSSION

Bunke contends that his conviction violates his constitutional right to due process and to a fair trial, as guaranteed by the Fifth and Sixth Amendments, because he did not have fair warning that his conduct violated Jones's rights. He also argues that the district court abused its discretion in refusing to provide funding for expert testimony and in denying his motion for acquittal.

### A.   Fair Warning

Bunke claims that he was unaware his actions were illegal because, according to the continuum-of-force chart, it is appropriate to kick an inmate who wrestles with officers. This Court reviews *de novo* whether a trial defendant's constitutional rights were violated. *United States v. Webber*, 208 F.3d 545, 550 (6th Cir.), *cert. denied*, 531 U.S. 882 (2000).

Federal law forbids anyone acting "under color of any law" from "willfully subject[ing] any person . . . to the deprivation of any rights, privileges, or immunities secured or protected by the

Constitution or law of the United States." 18 U.S.C. § 242. However, a defendant cannot be convicted of violating § 242 unless he had "fair warning" that his actions deprived the victim of a constitutional right. *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002). The Supreme Court has explained that "the standard for determining the adequacy of that warning [is] the same as the standard for determining whether a constitutional right was 'clearly established' in civil litigation under [42 U.S.C.] § 1983." *Id.* at 740 (*citing United States v. Lanier*, 520 U.S. 259, 270-71 (1997)) (footnote omitted). When assessing whether a defendant had notice that his conduct violated established constitutional law, "the salient question . . . is whether the state of the law [at the time of the violation] gave [the defendant] fair warning that [his] alleged treatment of [the plaintiff] was unconstitutional." *Id.* at 741. Stated differently, the fair-warning requirement is met "if, but only if, in the light of pre-existing law the unlawfulness [under the Constitution is] apparent.'" *Lanier*, 520 U.S. at 271-72 (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in *Lanier*). When a defendant appeals a jury conviction, as here, the trial record is read in the light most favorable to the jury's verdict. *Id.* at 261.

Bunke was convicted of kicking and assaulting Jones while acting under color of state law, thereby depriving Jones of his Eighth Amendment right to be free from cruel and unusual punishment. It is beyond dispute that "[t]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (*quoting Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (other quotes and citation omitted) (omission in original); *United States v. Budd*, 496 F.3d 517, 531 (6th Cir. 2007),

*reh'g & reh'g en banc denied*, 2008 U.S. App. LEXIS 1846 (6th Cir.), *cert. denied*, 129 S. Ct. 48 (2008). Whenever a prison official is accused of using excessive physical force in violation of the Eighth Amendment, "the core judicial inquiry" to determine if there was unnecessary and wanton infliction of pain is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (*citing Whitley*, 475 U.S. at 320-21); *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008). The extent of the injury suffered by the inmate is one factor relevant to this analysis, as are "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (*quoting Whitley*, 475 U.S. at 321). Further, the Supreme Court has made clear that 'unnecessary and wanton' inflictions of pain include "those that are 'totally without penological justification.'" *Hope*, 536 U.S. at 737 (*quoting Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)); *Lockett*, 526 F.3d at 875. "Controlling an emergency situation and maintaining order are legitimate penological justifications, but when safety concerns have abated or an emergency has been dispelled, the justification may disappear." *Budd*, 496 F.3d at 531 (*citing Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979); *Hope*, 536 U.S. at 738).

Viewed in the light most favorable to the jury's verdict, the evidence supports that Jones was taken to the multipurpose room by Bunke and three other guards for a strip search. During the "squat and cough" part of the search, Jones slapped his behind and made possibly obnoxious statements. Without further provocation on his part, Jones was thrown to the floor face down with his hands

beneath his chest; he remained in this position throughout the incident. Jones did not strike or attempt to punch the officers; evidence that he tried to bite an officer is inconclusive. At the time of the assault, there were at least six male officers surrounding Jones: two sat on his legs while Bunke and three others tried to pry his arms out from under him. Bunke gave Jones several hard blows to the right side, the head, or both. Jones displayed injuries to his ribs and lung consistent with an assault and bruising below the eyes that typically connotes a head injury. Officers who witnessed the incident testified that there was no legitimate law-enforcement reason to kick Jones.

The law as it then existed gave Bunke fair warning that, under the circumstances, his actions violated Jones's Eighth Amendment rights. Assuming, arguendo, that the takedown was justified, the nondefendant witnesses unanimously agreed that Jones posed no threat at the time of the assault. Bunke argues that he acted to protect McConnell from being bitten, but no witness actually saw Jones try to bite anyone. The jury was free to reject Bunke's account as inconsistent with the evidence. Moreover, Jones's resistance to being handcuffed did not constitute a threatening situation under the circumstances: witnesses testified that Jones was pinned to the floor by six guards, that he did not attempt to hit or punch anyone and that he posed no threat. In the absence of any legitimate penological justification, the pain inflicted upon Jones was, by definition, cruel and unusual punishment. *See Hope*, 536 U.S. at 737; *Whitley*, 475 U.S. at 319.

Bunke asserts that, even if he violated Jones's rights, his conviction should be overturned because 18 U.S.C. § 242 and Eighth Amendment law were too unclear to give him fair warning at

the time of the incident. "There are three related manifestations of the fair warning requirement,"

*Lanier*, 520 U.S. at 266:

> First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine, the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope. In each of these guises, the touchstone is *whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal*.

*Id.* at 266-67 (internal quotes and citations omitted) (emphasis added).

At the time of the incident, the Eighth Amendment unequivocally prohibited using force in a malicious and sadistic manner to inflict unnecessary and wanton pain. *Hudson*, 503 U.S. at 7. The law also made clear that applying force without a legitimate penological justification amounts to unnecessary and wanton infliction of pain. *Hope*, 536 U.S. at 737. *Hudson*, *Hope* and other relevant Supreme Court opinions are not "so vague" that a man of common intelligence would question whether Bunke's conduct fell within their ambit. Still, if any doubt remained, the judicial gloss supplied by this Court in *Budd*, 496 F.3d at 531-33, clarified that the Constitution proscribes using force without provocation against a prisoner who does not pose any threat.[10]

---

[10]In *Budd*, a handcuffed inmate (Moore) was slammed violently into a window frame and taken to the ground. 496 F.3d at 531-32. Once on the floor,
> Moore did not move around, did not try to get back up, and did not verbally or physically threaten anyone–[Officer] Tinkey testified that Moore "wasn't going

Throughout his brief, Bunke attributes great importance to whether the jury found that he kicked Jones in the head or that he kneed him in the side.[11] Bunke argues that the physical evidence does not support the first possibility because Jones's head injuries were not serious enough to result from repeated kicks with steel-toed boots. As to the second option, Bunke submits that he did not have fair warning that kneeing an inmate under these circumstances amounted to criminal conduct. Bunke ignores the likeliest possibility, which is that the jury found him guilty of kicking Jones in the side.[12] In any case, this argument is irrelevant to whether Bunke had notice that his conduct violated Jones's constitutional rights. What matters is not whether Bunke kicked or kneed Jones, but

> anywhere" and "wasn't a threat to anyone." Budd, agitated and cursing Moore, stepped on Moore's back with both feet. . . . Officer Oliver testified that he saw no law-enforcement reason for Budd's actions; Officer Tinkey testified that he did not see "any need" for Budd's actions and that "being obnoxious" is not a reason to use force on a prisoner."

*Id.* at 532 (citations to record omitted). This Court affirmed Budd's conviction under 18 U.S.C. § 242 because: "A rational factfinder could have concluded that Budd acted without penological justification and therefore unnecessarily and wantonly inflicted pain on Moore in violation of the Eighth Amendment." *Id.*

The critical point in *Budd* was that the inmate did not do anything to justify the assault and did not pose a threat to officers or prison security; in other words, the defendant lacked any legitimate penological justification for his actions. The same is true here.

[11]In ruling on certain challenges to Bunke's Presentence Investigation Report, the district court observed that the jury's verdict "could have been based on Defendant's own testimony that he kneed Jones in the side as opposed to kicking Jones in the head."

[12]Two witnesses (Elizondo and Branch) saw Bunke kick Jones in the side. One (McQueary) said Bunke kicked Jones in the head. Jones initially told investigators that he was kneed, but at trial he testified that he could not see what was happening because his eyes were closed. Bunke was the only witness to affirmatively testify that he kneed Jones.

"whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 9.

Finally, Bunke claims he could not have anticipated the illegality of his conduct because he acted consistently with his training as a corrections officer. He argues that, based on the continuum-of-force chart, kicking is an appropriate response when an inmate wrestles with an officer. Bunke asserts that he acted properly because Jones was wrestling. This argument fails for three reasons. First, the jury could reasonably conclude that Jones was not wrestling. Second, even if Bunke's reading of the continuum-of-force chart was correct, an internal training document cannot overrule or otherwise render inapplicable well-established Supreme Court precedent. Third, the evidence overwhelmingly supported that, whatever may have transpired prior to the take down, the kicking occurred when Jones posed no threat.

Bunke had fair warning that his actions infringed upon Jones's Eighth Amendment protection from cruel and unusual punishment. Therefore, his conviction did not violate due process.

**B.    Funding for Expert Witness**

Bunke challenges the district court's order denying his motion to appoint Dr. Harvey Shulman as an expert witness to testify about how several people who witness the same event can perceive it differently. A trial court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Langan*, 263 F.3d 613, 620 (6th Cir. 2001).

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may

testify thereto." Fed. R. Evid. 702. Courts use a two-pronged analysis to determine the admissibility

of expert testimony:

> First, the court must determine whether the expert's testimony reflects "scientific knowledge," that is, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Second, the court must ensure that the proposed expert testimony is relevant to the task at hand and will serve to aid the trier of fact.

*United States v. Smithers*, 212 F.3d 306, 313 (6th Cir. 2000) (*quoting & citing Daubert v. Merrell*

*Dow Pharm.*, 509 U.S. 579, 592-93 (1993)).

This Court has often acknowledged the increasing use and reliability of expert testimony on

eyewitness identification, as well as its potential significance for criminal defendants. *See, e.g.*,

*Ferensic v. Birkett*, 501 F.3d 469, 478, 481-83 (6th Cir. 2007) (discussing the "near-universal

acceptance of the reliability of" such testimony). In *Langan*, the Court observed that "such

testimony has been allowed in with increasing frequency where the circumstances include 'cross-

racial identification, identification after a long delay, identification after observation under stress,

and [such] psychological phenomena as . . . unconscious transference.'" 263 F.3d at 621 (*quoting*

*United States v. Harris*, 995 F.2d 532, 535 (4th Cir. 1993)) (alteration and omission in *Langan*). The

Court has also indicated that "expert testimony should be admitted . . . when there is no other

inculpatory evidence presented against the Defendant with the exception of a small number of

eyewitness identifications." *Smithers*, 212 F.3d at 317.

Despite its favorable disposition towards expert testimony on eyewitness identification, this

Court does not permit such evidence to be admitted in every case. In *Smithers*, the Court identified

several factors that can weigh against admissibility, for example: "whether this type of testimony touched on the 'ultimate issue' in the case and therefore usurped the jury's role; whether there was other evidence against the defendant; and whether the jury could more properly evaluate the reliability of eyewitness testimony through cross-examination." *Id.* at 314. The Court noted that "[w]here identification rests on testimony by someone who knew the defendant well and was in a good position to see the crime, or where the identification seems strongly established for other reasons (like physical evidence connecting defendant to the crime), there is little reason to admit such testimony." *Id.* at 317 n.4 (*quoting* Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence*, § 6.37, at 601 (1995)). The Court also emphasized the importance of assessing whether the testimony in question will actually help the jury or add to its confusion. *Id.* at 314; *Langan*, 263 F.3d at 624.

In this case, the district court held that Dr. Shulman's testimony was inadmissible under the second *Daubert* prong.[13] The court observed that none of the circumstances identified in *Langan* were present and that the proposed witnesses were co-workers who knew Bunke relatively well. The court also noted that "[e]valuating issues related to the memory and recall by an individual known to the eyewitness is well within the normal experiences and capabilities of a lay juror." Order Denying Mot. to Appoint Expert Witness 2-3 (Sept. 22, 2008). Lastly, the court pointed out that it

---

[13]The first prong of *Daubert* is not at issue here. Dr. Shulman frequently testifies as an expert on issues of eyewitness identification and this Court has previously found that certain defendants were prejudiced when their requests to have Dr. Shulman testify were denied. *See, e.g.*, *Ferensic*, 501 F.3d at 480.

- 14 -

would instruct the jury on how to deal with eyewitness testimony and that the Government planned to offer other evidence that did not rely solely on eyewitness identification.

Bunke objects that he did not intend for Dr. Shulman to address the issue of identification. Bunke asserts that his objective was "to have an expert explain how multiple people can see the same event and report it differently, doing so out of confusion rather than dishonesty." He argues that, without this explanation, the jury had to decide whether the corrections officers who testified against him were lying or telling the truth. Bunke appears to suggest that, had Dr. Shulman been able to testify, the jury could have found that the incident was so confusing that, despite their sincere efforts, the witnesses were unable to describe it accurately.

This Court's case law neither supports nor rules out admitting expert testimony for this purpose. Existing cases (including those on which Bunke relies) deal exclusively with the accuracy of eyewitness *identifications*. There may indeed be cases where a jury would genuinely benefit from expert testimony on how different witnesses can have varying perceptions of the same event. But Bunke offers no particular reason why witnesses to this incident could have perceived it differently, except that it was confusing and happened quickly. Moreover, it is within the ordinary knowledge of lay jurors that a fast-developing and confusing event is more likely to be perceived differently by observers than a simple, slow-occurring incident. This fact was underscored by the inconsistent testimonies of the corrections officers at trial. In addition, the testimony against Bunke was not limited to what occurred in the multipurpose room. Several witnesses observed that Bunke had blood on his boots after the incident. There was also testimony that Bunke told others "I can't

believe I kicked him" and announced that he "kicked an inmate's ass" over a prison intercom. This supplemental evidence allowed the jury to parse contradictions in the different testimonies and come to a reasonable conclusion as to what actually happened.

The district court did not abuse its discretion in refusing to appoint Bunke's expert.

## C.     Motion for Acquittal

This Court reviews *de novo* the denial of a motion for acquittal. *United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004). In doing so,

> [w]e must determine "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [*United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002)] (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979) (emphasis in original)). We do not "weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (quoting *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984)).

*Id.*

The evidence supports that Bunke kicked or otherwise struck Jones several times in the side, causing significant injuries to Jones's ribs and lung. Bunke argues that a reasonable jury could not convict him because he acted to protect a fellow officer and to overcome Jones's resistance to being handcuffed. However, at best, the evidence neither established that Jones tried to bite McConnell nor that McConnell actually risked being bitten. Furthermore, nondefendant witnesses agreed that Jones did not pose a security threat at the time of the assault. The jury apparently found that there

was no legitimate penological justification for Bunke's actions; in light of the evidence, this was an

entirely reasonable conclusion.

The district court did not abuse its discretion in denying Bunke's motion for acquittal.

## III.   CONCLUSION

The district court's judgment of conviction is **AFFIRMED**.