**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0378n.06

**No. 08-1342**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| TAMMY MURRAY and JAMES MURRAY, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | **FILED**<br>**May 28, 2009**<br>LEONARD GREEN, Clerk |
| v. | ) ) | |
| CADET COWELL, SERGEANT CULLEN and CITY OF TAYLOR, Jointly and Severally, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendants-Appellees | ) ) | |
| and | ) ) | |
| SCOTT ATKINSON and OFFICER MASTERSON, | ) ) ) | |
| Defendants. | ) | |

Before: SUHRHEINRICH, BATCHELDER and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Tammy and James Murray challenge a final judgment rejecting their speech-retaliation and state law public-records claims as a matter of law. We affirm.

I.

Just after midnight on February 5, 2006, Tammy Murray made a right-hand turn without stopping her car for a red traffic light, almost colliding with a City of Taylor police car. After pulling

her over, the officer noticed alcohol on her breath, and a breath test confirmed the officer's suspicions: Her blood-alcohol level was 0.22 percent. The officer arrested her and took her to jail.

At the jail, Tammy Murray began to cry, demanding to be taken to the hospital because of a panic attack; she also, the defendants maintain, threatened to kill herself. The officers declined to take her to a hospital, but they did place her in a suicide-prevention gown—a tear-resistant garment designed to prevent a prisoner from trying to hang herself. Tammy Murray was released from jail the following day.

While the drunk-driving charge against her was pending, Murray filed a state-law freedom of information request, seeking, among other things, "any and all files, . . . incident reports, . . . prisoner/jail records, . . . , and anything tangible in your possession pertaining to the arrest, booking or incarceration of Tammy L. Murray." ROA 281. In response, the City gave her a number of documents. Murray pleaded no contest to the charge.

Tammy Murray and her husband, James Murray, sued a group of police officers involved in the incident as well as the City of Taylor in Michigan state court, bringing (among other claims) a speech-retaliation claim under 42 U.S.C. § 1983 and a state-law FOIA claim. The defendants jointly removed the case to federal court and moved for summary judgment on the Murrays' claims. The district court granted summary judgment to the defendants on all counts.

II.

The Murrays first challenge the district court's rejection of their speech-retaliation claims against Cadet Cowell and Sergeant Cullen. To establish a prima facie First Amendment speech-retaliation claim against government officials under § 1983, a claimant must present sufficient evidence that (1) she "engaged in constitutionally protected speech," (2) the defendants took "adverse action" against her of a sort "that would deter a person of ordinary firmness from continuing to engage in that conduct" and (3) "there is a causal connection" between the speech and the adverse action. *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006).

A.

*Tammy Murray's retaliation claim.* When Tammy Murray arrived at the police station at about one in the morning, Cadet Cowell booked her and gave her a breathalzyer test, confirming that she was still drunk. Although initially cooperative, she became irritated as the booking process continued. After Cowell told her that she would need to remain in jail until 11:00 a.m. the next morning so that she could sober up, she asked if she would need to stay longer if she threw a "hissy fit" and acted like a "stupid bitch." Audio Ex., Booking 031, at 1:40. When Cowell conducted an inventory of the items in her purse, she became annoyed and asked if he "want[ed] to search [her] pants, [her] socks, [or her] bra," or if he "want[ed] to give [her] an anal search." Audio Ex., Booking 033, at 5:50.

Cowell placed Tammy in a holding cell around 2:00 a.m. that morning. At some point later that morning, she "started [her] period," ROA 118, and an officer provided her with tampons and sanitary napkins. Later, she claims, her "stomach started hurting," and she "didn't know if [she] was going to [get sick] or not," so she asked to be taken to a hospital. ROA 121. Her request was relayed to Cowell's superior, Sergeant Cullen, who decided to keep her at the jail.

After Sergeant Cullen refused to transport her to the hospital, she had "a panic attack" and became "really, really nervous," ROA 126, and eventually began "crying," ROA 127. Female officers took her out of her cell and ordered her to remove her clothing and don a suicide-prevention gown—essentially a sleeveless, calf-length brown dress—at just after six in the morning. While putting on the gown, Tammy denied being suicidal. She was allowed to call James Murray to request that he bring her medicine to the station. During the phone call, she complained that the officers had not allowed her to go to the hospital despite the fact that she was suffering from stomach and tooth pain, asked her husband to bring Motrin to the station and told him to call a lawyer.

This sequence of events fails as a matter of law to state a speech-retaliation claim under the First (and Fourteenth) Amendment. Granting for the sake of argument that her complaints to the officers and to her husband were protected by the First Amendment and that the officers engaged in adverse action against her when they ordered her to wear a suicide-prevention gown, she has failed to establish causation as a matter of law. The key problem is that Tammy Murray's undisputed actions gave the officers ample reason—indeed good cause—to ask her to don the suicide gown. By her own admission, she felt "really, really nervous" and "started crying" when the officers would

not take her to the hospital. ROA 126–27. The recorded evidence confirms that she told Cadet Cowell that she "was having . . . a panic attack" and began to cry loudly, Audio Ex., Booking 059, at 13:25; Audio Ex., Booking 060, at 0:00, and she repeatedly insisted, while crying, that she "want[ed] to go to the hospital now," Audio Ex., Booking 065, at 0:18. Add to all of this that she was quite drunk and otherwise behaving oddly, and the officers had reasonable grounds as a matter of law for placing the suicide gown on her.

That Tammy did not say that she intended to harm herself does not change matters. Prison officials need not wait that long—so long that it is potentially too late—to deal with a inmate who may be a threat to herself. No doubt, there is a disputed issue of fact as to whether Tammy said that she would hurt herself: The officers testified that she made the threat, and she denied it. But, in view of the other undisputed evidence of Tammy's unstable mental status, the officers acted well within their rights in putting the gown on her.

*Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998), does not help Tammy. The decision merely addressed the standard for pleading a retaliation claim in a complaint, not the amount of evidence needed to take a claim past summary judgment. *Id.* at 681–82. A plaintiff's burden in a retaliation case is to show that the "protected activity"—here, her complaints to the officers—"was the likely reason for the adverse action." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 527–28 (6th Cir. 2008). In view of her admitted behavior that night, Tammy Murray cannot meet that burden.

B.

*James Murray's speech-retaliation claim.* James' theory of liability is that the officers placed the suicide gown on Tammy to retaliate against *him* for his complaints. In support, he points to the following facts: After arriving at the station with his wife's medicine, he spoke with Sergeant Cullen, who informed him that the officers would not take Tammy to the hospital because Cullen "[did not] feel that she needs to go." JA 322; *cf.* JA 327. He then told Cullen that, "if something happens to [Tammy], you're f. . .ed," to which Cullen replied, "No, she's f. . .ed now." JA 322. James maintains that this conversation occurred shortly before the 6:00 a.m. gowning, and some evidence suggests that he was at the station in the vicinity of 5:30 a.m.

The district court did not err in rejecting this claim as a matter of law. Even if we assume that James Murray's threat was protected by the First Amendment and that Sergeant Cullen's response showed an intent to retaliate, the officers' placement of a suicide gown on Tammy Murray did not amount to an "adverse action" against her husband. An action is materially adverse if it would deter a person "of ordinary firmness" from exercising his protected rights. *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008); *Bloch*, 156 F.3d at 678.

As we have shown, however, the officers had ample reason to place the suicide gown on Tammy before James arrived on the scene. Under these circumstances, there is nothing adverse—from James' perspective—about the officers' efforts to protect his wife from hurting herself. Had the officers no basis for placing the gown on Tammy, that might be a different story.

But where an inmate is intoxicated, experiencing a panic attack, crying loudly and at length and otherwise behaving strangely, officers do not engage in an adverse action against her family members when they take the modest step of placing a suicide gown on the inmate to protect her from herself.

## III.

The Murrays also challenge the district court's rejection of their FOIA claim. Michigan's Freedom of Information Act requires "public bod[ies] [to] furnish a requesting person a reasonable opportunity for inspection and examination of [their] public records." Mich. Comp. Laws § 15.233(3). "[P]ublic record[s]" include any "means of recording . . . meaningful content" that is "prepared, owned, used, [possessed], or retained by a public body in the performance of an official function." *Id.* § 15.232(e) & (h). If a public body does not produce a covered record, the requesting person may sue to compel disclosure. *Id.* § 15.240(1)(b) & (4).

The Murrays made a FOIA request for "any and all files, file folders, police complaints, incident reports, PCRs, standard crime reports, citizen complaints, notes, mug shots, photos, print cards, prisoner/jail records, inmate visitor logs, and anything tangible in your possession pertaining to the arrest, booking or incarceration of Tammy L. Murray." ROA 281. In response, the city sent them "the incident/supplemental report, the Taylor Police Department Lock Up Log, the Breath, Blood, Urine Test Report, the BAC DataMaster, print cards and mug shot." *Id.*

The first problem, the Murrays claim, is that the city violated FOIA by failing to produce "the audio and video records related to her stay at Taylor City Jail." Appellants' Br. at 24. But the record

shows that the city has given the Murrays the jail video and audio—indeed, that is the key evidence we have used to assess the validity of their speech-retaliation claim. To the extent the Murrays claim that there are gaps in these records, they have presented no evidence to show that this is so or even argued what incidents from the jail are missing from the recordings. The recordings themselves do not show one way or another whether they are missing relevant information. Because the city has produced all records that are responsive to the Murrays' request, there is no basis for issuing an order compelling disclosure.

The second problem, the Murrays claim, is that they are entitled to damages even if the city has produced all relevant records. The state FOIA law provides a right to recover compensatory and punitive damages "[i]f the . . . court determines . . . that the public body has arbitrarily and capriciously violated th[e] act by refusal or delay in disclosing or providing copies of a public record." Mich. Comp. Laws § 15.240(7). Although Michigan law normally allows the recovery of damages only after a court has ordered that a record be disclosed, *see* Mich Comp. Laws § 15.235(3)(b); *Mich. Council of Trout Unlimited v. Dep't of Military Affairs*, 539 N.W.2d 745, 752–53 (Mich Ct. App. 1995), there is an exception to this rule when the defendants have "rendered a judicial order of disclosure impossible by disposing of the only extant copy of [a] document," *Walloon Lake Water Sys., Inc. v. Melrose Twp.*, 415 N.W.2d 292, 296 (Mich. Ct. App. 1987).

The Murrays claim that the city's destruction of the squad-car video of Tammy's arrest amounts to a FOIA violation that supports a damages action. The short answer, however, is that the Murrays' FOIA request did not cover this recording. The squad-car video is not a "prisoner-jail

record[],” a “file” or any of the other types of records sought in the request—which defeats this claim as a matter of law. *See* Mich. Comp. Laws § 15.235(2) (making a request for a document the foundation of a public body's duty to disclose); *id.* § 15.240(7) (making damages available only where there has been a “violat[ion]” of the Act).

The Murrays further claim that the delayed production of the jail audio and video recordings supports a damages action. The city, to be sure, omitted these items from its initial FOIA response and produced them only during this litigation. And the Murrays' FOIA request, we will assume for the sake of argument, covered these recordings because the letter asked for any “prisoner-jail records,” JA 281, and the statute defines “public records” to include any “means of recording . . . meaningful content” that is “retained by a public body in the performance of an official function,” Mich. Comp. Laws § 15.232(e) & (h). But the failure to disclose every record responsive to a FOIA request does not support a damages award unless the public body acted arbitrarily and capriciously. *See id.* § 15.240(7). A mistake by itself does not meet the standard if the error was “reasonable” under the circumstances and not a “whimsical” decision or an act of “will or . . . caprice.” *See Laracey v. Fin. Insts. Bureau*, 414 N.W.2d 909, 911 (Mich. Ct. App. 1987). The Murrays offer no evidence showing that the city acted on the basis of improper reasons in delaying its production of the jailhouse recordings. By all accounts, the production was delayed only because the FOIA coordinator was not aware that any such recordings existed, a lapse that occurred in part because the Murrays did not ask for audio or video files with more clarity. This is not the kind of bureaucratic

slip—partly attributable to the vague nature of the Murrays' request—that entitles an individual to damages. *See id.*

The authorities cited by the Murrays do not hold otherwise. In *Krug v. Ingham County Sheriff's Office*, 691 N.W.2d 50 (Mich. Ct. App. 2004), the court held that damages were available because the defendant had "conceal[ed] the requested records" and "falsely indicated . . . [that they] were exempt from disclosure." *Id.* at 56. But no similar sort of bad faith occurred here. The city did not claim that the recordings were exempt, and no evidence indicates that it attempted to conceal the recordings from the Murrays. Nor is this case like *Walloon*, in which the defendant—who was aware that the plaintiff sought disclosure of a letter—initially refused to release it (without giving the explanation required by the FOIA) and later disposed of it so that it could never be produced. 415 N.W.2d at 732–33. The common thread running through the Michigan decisions awarding damages for FOIA violations is an arbitrary, if not willful, failure to live up to the Act's requirements. *See, e.g.*, *Meredith Corp. v. City of Flint*, 671 N.W.2d 101, 109 (Mich. Ct. App. 2003) (finding that defendant had "pursued a strategy that delayed release of" records subject to disclosure); *Kincaid v. Dep't of Corr.*, 446 N.W.2d 604, 607 (Mich. Ct. App. 1989) (finding that defendant had pretended to be confused by the plaintiff's requests and then ignored them). Because the Murrays have not shown that the city did anything other than make a reasonable mistake, they cannot obtain damages.

Even so, the Murrays claim, they are entitled to attorney's fees and costs for the time and trouble of making the FOIA claim. The statute provides for the recovery of fees and costs whenever

a person "prevails in an action commenced" under the FOIA, *see* Mich. Comp. Laws § 15.240(6), and the Michigan courts say that a person has prevailed—even if she has not obtained a judicial order awarding damages or compelling disclosure—so long as the lawsuit "was necessary to and had a substantial causative effect on the delivery of or access to" documents requested by the plaintiffs that are subject to disclosure under FOIA, *Wilson v. City of Eaton Rapids*, 493 N.W.2d 433, 434 (Mich. Ct. App. 1992).

The Murrays, however, have not shown that their lawsuit was needed to obtain access to the materials they sought. They do not offer any evidence suggesting that, had they followed up their original request with a more specific demand for audio and video recordings, the city would have refused absent pending litigation. They do not suggest, for instance, that the city concealed the existence of the recordings once it knew that the Murrays were seeking them. *Cf. Krug*, 691 N.W.2d at 56 (awarding fees where the defendant had "conceal[ed] the requested records" after suit had been filed). Nor have the Murrays offered any rebuttal to the city's asserted reason for the delayed production—that the FOIA coordinator simply did not know that the tapes existed or that they were responsive to the request at the time of the initial production. On this record, and in light of the fact that the recordings were in fact produced to the plaintiffs during discovery, there is no reason to think that the city would have done anything other than promptly provide the recordings if the Murrays had made a follow-up request before they sued. Accordingly, because "under these facts there was no need for the [Murrays'] lawsuit, [they] cannot be deemed to be the prevailing part[ies]," so there is no basis for an award of fees and costs. *Wilson*, 493 N.W.2d at 434.

IV.

For the first time in their reply brief, the Murrays claim that their failure to produce supporting evidence stems from delayed discovery production. Yet this argument is doubly forfeited: first by the Murrays' failure to make a motion under Rule 56(f)(2) of the Federal Rules of Civil Procedure requesting additional discovery in order to respond to the summary judgment motion, *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006), second by the Murrays' failure to raise the issue in their opening appellate brief, *United States v. Moore*, 376 F.3d 570, 576 (6th Cir.2004).

V.

For these reasons, we affirm.