RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOSEPH JOHNSON,

                *Plaintiff-Appellant*,

    *v.*

CLAIR SOOTSMAN,

                *Defendant-Appellee*.

No. 22-1937

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:20-cv-01102—Jane M. Beckering, District Judge.

Argued: July 26, 2023

Decided and Filed: August 16, 2023

Before: McKEAGUE, GRIFFIN, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Adam G. Winn, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Richard V. Stokan, Jr., KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Appellee. **ON BRIEF:** Adam G. Winn, Robert G. Kamenec, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Richard V. Stokan, Jr., Joanne Geha Swanson, KERR, RUSSELL AND WEBER, PLC, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

MURPHY, Circuit Judge. This case shows that just because a correctional officer may have violated a prison use-of-force policy or committed a state-law tort does not necessarily mean that the officer violated the Eighth Amendment's ban on "cruel and unusual punishments."

While serving a short sentence, Joseph Johnson caused a disturbance in a jail's intake area. Officers chose to take Johnson to his cell, but he then disobeyed orders to slow down. So another officer, Deputy Clair Sootsman, stopped him. After a brief exchange, Johnson stepped in Sootsman's general direction. Sootsman testified that he viewed this conduct as a threat. In response, he immediately grabbed Johnson's neck, pushed him against the wall, and took him to the ground to be handcuffed. This force lasted about seven seconds. Investigators found that Sootsman's actions violated jail policies, and Sootsman pleaded guilty to a misdemeanor battery.

Johnson later sued Sootsman, alleging that his conduct violated the Eighth Amendment. But this constitutional claim requires Johnson to meet a demanding standard. He must prove that Sootsman used force "maliciously and sadistically for the very purpose of" inflicting pain. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citation omitted). Johnson's claim will fail, by contrast, if Sootsman used force out of a belief—even an unreasonable belief—that the force was necessary to control Johnson. *See id.* We affirm the district court's summary-judgment ruling for Sootsman because Johnson lacks enough evidence to meet this demanding Eighth Amendment test. That said, the States may impose stricter limits on officers than the Constitution demands. So our holding does not foreclose all relief for Johnson. It just means that he must try to seek that relief using his state tort claim that the district court dismissed without prejudice.

I

In 2019, Johnson pleaded guilty to a domestic-violence offense in Michigan, spent several days in jail, and began to serve a term of probation. On February 13, 2020, a state court found that Johnson had violated the conditions of his probation and sentenced him to a few weeks at the county jail in Kalamazoo, Michigan.

Right after this court hearing, Johnson was taken to the jail to begin his sentence. When detainees first enter the jail, they get processed in its intake area. The intake area contains cells that hold detainees for a short time until jail staff either transfer them to the general population or release them. Staff initially housed Johnson in this area.

The next morning, Deputies Sootsman and Chantel Einhardt worked the first shift in the intake area. Johnson remained there. About an hour after Einhardt arrived, she heard Johnson "yelling and banging" on his cell door. Einhardt Dep., R.45-6, PageID 232–33. Johnson was upset because he "wanted to be moved to general population." *Id.*, PageID 232. Einhardt told him that he would likely get moved soon and that she would have to restrain him if he continued to hit the door. He stopped.

As Einhardt anticipated, jail staff planned to transfer Johnson to his general-population cell that afternoon. Shortly before 3:30 p.m., they left an unhandcuffed Johnson in the intake area's unsecured open space as they arranged for his transfer. While waiting, Johnson wrapped a towel around his head in violation of jail policy. Deputy Alan Miller, who was assisting in the area, asked him to remove it. Johnson refused and began to argue with Miller. Johnson also threw his sack lunch.

Deputy Sootsman was in the intake area at this time. Based on Johnson's prior incarcerations, Sootsman knew that he had argued with deputies and disobeyed their orders in the past. Sootsman also saw Johnson's confrontation with Deputy Miller and watched him throw his lunch. But Sootsman opted not to intervene because he was rounding up two other detainees to take to their general-population cells. Sootsman walked out of the intake area with these unrestrained inmates while Johnson continued to argue with Miller.

Meanwhile, Deputy Einhardt returned to the intake area after helping transfer other detainees who had court appearances. She learned from a booking clerk that Johnson had thrown his lunch and believed that his argument with Miller "was escalating very quickly." *Id.*, PageID 234. (Miller claimed that he was not arguing with Johnson but agrees that Johnson was "being loud[.]" Miller Dep., R.45-7, PageID 267.) To reduce tensions, Einhardt decided to move Johnson to general population herself. Given Johnson's animated state, she asked Deputy Talia Harris to accompany her. Johnson grabbed his things and began to walk with them. After this group left the intake area, however, Johnson started to speed walk ahead of the two deputies. Einhardt twice ordered Johnson to slow down so that she could keep control of him, but he appeared to ignore her.

To get to the jail's general population from its intake area, they had to walk down a long hallway. Three security cameras record video (but not audio) of this hallway. The video demonstrates that Deputy Sootsman and his two detainees entered this hallway first on their way to the general-population area. Sootsman recalled hearing Johnson. The video also confirms his memory: It captures him and his two detainees stopping and looking at a commotion behind them as they entered the hallway. Given their pause and Johnson's fast pace, he quickly caught up with them and passed them on the right. The video next shows Sootsman pointing toward the right wall as Johnson passed. Sootsman said that he ordered Johnson to stop.

Johnson took many more steps before eventually stopping with his back against the wall. Sootsman, who took a position closer to general population in front of Johnson, spoke to him for about twelve seconds. According to Johnson (whose account we must accept), Sootsman angrily told him that he was "being a pussy" and that he should look Sootsman "in the eyes." Johnson Dep., R.45-3, PageID 187. Johnson allegedly said "I am," but nothing else. *Id.* The video then shows Johnson take a slow step in the direction of Sootsman and the general-population area.

Sootsman testified that he perceived Johnson's step "as a threat[.]" Sootsman Dep., R.45-5, PageID 217. On the video, Sootsman can be seen forcefully pushing Johnson back against the wall with his right arm and restraining him there for about two seconds. According to Johnson, Sootsman grabbed his neck and "choked" him. Johnson Dep., R.45-3, PageID 178. Johnson also claimed that he hit the "back of [his] head on the wall" when Sootsman pushed him. *Id.* Deputies Harris and Einhardt agreed that Sootsman "grabbed [Johnson's] neck" when pushing him. Harris Dep., R.45-4, PageID 201; Einhardt Dep., R.45-6, PageID 237. Deputy Miller had also followed the others and caught up with them. He suggested that Sootsman "squeezed [Johnson's] throat" in order to gain control of him. Miller Dep., R.45-7, PageID 272. According to Sootsman, by contrast, he used an "open" hand to push Johnson at the base of his neck. Sootsman Dep., R.45-5, PageID 217. The video does not show which of these conflicting stories is true.

But it does show that Sootsman immediately turned Johnson around and took him to the ground by putting him in a chokehold and pulling him down. Einhardt assisted in this takedown by grabbing Johnson's arms. The entire use of force from the time that Sootsman pushed

Johnson to the time that Sootsman got him on the ground lasted about seven seconds.  Once Johnson was on the ground, the officers brought him to a sitting position.  Einhardt handcuffed him.  The officers then pulled a handcuffed Johnson up and continued to walk him to the general-population area.

Sootsman's use of force caught the other deputies off guard.  Einhardt described his actions as "out of the blue[.]"  Einhardt Dep., R.45-6, PageID 236.  Harris testified that Sootsman's actions surprised her because she did not think that Johnson did anything to justify them.  Harris Dep., R.45-4, PageID 201, 203.  Miller likewise did not believe that Johnson's conduct "warranted" Sootsman's use of force.  Miller Dep., R.45-8, PageID 280.

Johnson filed a grievance against Sootsman.  A jail investigator found that Sootsman's use of force did not follow the use-of-force policy of the sheriff's department.  The investigator also found that probable cause existed to believe that Sootsman had assaulted Johnson "by grabbing him by the neck and squeezing his throat."  Rep., R.51-3, PageID 606.  The investigator placed Sootsman on leave, and prosecutors charged him with a battery.  Sootsman chose to retire.  He later decided to plead guilty to a battery misdemeanor and pay $546 in fines and court costs rather than face the greater expense of trial.

As for the harm that this encounter caused Johnson, the investigator found that Johnson voiced a complaint of "discomfort in his throat" but had "no visible injuries[.]"  Rep., R.51-3, PageID 606.  Johnson claimed that he requested to see medical staff but that the jail staff ignored him.  He did not visit any medical personnel while in the jail.  He also did not seek medical attention until a year after this incident and several months after he brought this suit.  Johnson testified that the incident has caused him to have bad headaches and neck pain for which he has received physical therapy.  Johnson Dep., R.45-3, PageID 175–77.  He added that his medical providers have instructed him to wear a brace on his right wrist and to attend physical and occupational therapy for pain in his wrist and neck.  *Id.*, PageID 174–75, 183.

Johnson sued Sootsman, Einhardt, and Harris under 42 U.S.C. § 1983 and state tort law.  He alleged that Sootsman's and Einhardt's uses of force violated the Eighth Amendment.  He also alleged that Harris violated the Eighth and Fourteenth Amendments by failing to intervene

to stop this force.   And he alleged that Sootsman and Einhardt committed a battery under Michigan law.

After discovery, a magistrate judge recommended that the district court reject the federal constitutional claims and decline supplemental jurisdiction over the state tort claims. *See Johnson v. Sootsman*, 2022 WL 9806957, at *8 (W.D. Mich. July 1, 2022). The judge reasoned that Sootsman had not violated the Eighth Amendment because he used only *de minimis* force and had a plausible reason to do so. *Id.* at *5–6. The judge next held that Einhardt had acted properly in getting Johnson under control to handcuff him. *Id.* at *7. At the least, the judge suggested, the law did not clearly establish that Sootsman's and Einhardt's uses of force exceeded constitutional bounds. *Id.* at *6–7. The judge lastly found that Harris lacked sufficient time to intervene to stop their force. *Id.* at *7–8. The district court adopted these conclusions, granting summary judgment to the deputies on the federal claims and dismissing the state claims without prejudice. *See Johnson v. Sootsman*, 2022 WL 4298230, at *1–3 (W.D. Mich. Sept. 19, 2022).

Johnson appealed. He raised arguments only about Sootsman's conduct, so the parties agreed to dismiss Einhardt and Harris from the appeal. We review the district court's grant of summary judgment to Sootsman de novo, resolving all evidentiary conflicts in Johnson's favor at this stage. *See Griffin v. Hardrick*, 604 F.3d 949, 952–53 (6th Cir. 2010).

II

Sootsman has raised a qualified-immunity defense to Johnson's Eighth Amendment claim. That defense required Johnson to show *both* that Sootsman violated the Eighth Amendment *and* that Johnson's Eighth Amendment rights were so "clearly established" that any reasonable officer would have recognized that Sootsman's actions infringed them. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Supreme Court has held that we may resolve these two qualified-immunity "prongs" in any order—either by holding that a constitutional claim fails on its merits or by holding that a defendant's conduct did not violate clearly established law. *See id.* at 236. We find it appropriate to reject Johnson's Eighth Amendment claim on the merits in this case.

A

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Supreme Court has long held that the Fourteenth Amendment incorporates the Eighth Amendment's ban on "cruel and unusual punishments" against the States. *See Robinson v. California*, 370 U.S. 660, 666–67 (1962); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (plurality opinion). The Court has also long held that this ban does not just cover the formal "punishment" that a state court metes out to criminal defendants. The ban also applies to informal harms that prison officials inflict on convicted prisoners during their terms of incarceration. The Eighth Amendment thus regulates the force that prison guards use on prisoners, *see Whitley v. Albers*, 475 U.S. 312, 320 (1986), the medical care that prison doctors provide prisoners, *see Estelle v. Gamble*, 429 U.S. 97, 102–05 (1976), and the physical facilities in which prison administrators house them, *see Rhodes v. Chapman*, 452 U.S. 337, 345–47 (1981). In each setting, the ban on cruel and unusual punishments prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Hudson*, 503 U.S. at 5 (quoting *Whitley*, 475 U.S. at 319); *see also Rhodes*, 452 U.S. at 346.

What qualifies as the "unnecessary and wanton infliction of pain"? This requirement has objective and subjective components, both of which follow from the Eighth Amendment's text. *See Phillips v. Tangilag*, 14 F.4th 524, 535 (6th Cir. 2021); *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). Objectively, harm to a prisoner must rise to a sufficiently serious level because the Eighth Amendment prohibits only "cruel and unusual" deprivations, not just uncomfortable or "even harsh" ones. *Rhodes*, 452 U.S. at 347; *see Phillips*, 14 F.4th at 534. Subjectively, harm to a prisoner must result from a prison official's sufficiently volitional actions because the Eighth Amendment bars only willful conduct that "inflict[s]" "punishment," not accidental conduct that causes injury. *See Phillips*, 14 F.4th at 535 (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)).

Yet the nature of these objective and subjective tests "varies" depending on the type of action (or inaction) that injures a prisoner. *Hudson*, 503 U.S. at 5–6, 8–9. Johnson challenges a correctional officer's use of force. In this use-of-force context, the Supreme Court has applied a more demanding subjective test but a more relaxed objective test. *See id.*

As a subjective matter, the Court has held that prisoners who challenge a correctional officer's use of force must prove more than that the officer acted with "deliberate indifference" to whether the force was necessary (the type of intent that prisoners must prove to challenge their conditions of confinement or medical care). *See id.* at 5–6; *cf. Wilson*, 501 U.S. at 302–03. The Court has instead described the "core judicial inquiry" in this use-of-force context as distinguishing between force used in a "good-faith effort to maintain or restore discipline" and force used "maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) (quoting *Hudson*, 503 U.S. at 7). Only the latter kind of force—force exerted maliciously and sadistically to inflict pain—violates the Eighth Amendment. *See Hudson*, 503 U.S. at 5–7. So even if an officer uses force because of an "unreasonable" belief that it is necessary to restrain a prisoner, the officer does not violate the Eighth Amendment. *Whitley*, 475 U.S. at 324.

As an objective matter, the Court has held that prisoners who challenge a correctional officer's use of force need not prove "extreme" or "serious" harms (the types of harms that prisoners must allege to challenge their conditions of confinement or medical care). *See Hudson*, 503 U.S. at 9. The Court reasoned that the Eighth Amendment's "contextual" objective element relies on our "contemporary standards of decency" to decide whether specific conduct qualifies as cruel and unusual. *Id.* at 8 (quoting *Estelle*, 429 U.S. at 103). And the malicious and sadistic infliction of pain violates these contemporary standards whether or not the pain leads to any significant injury. *Id.* at 9. After all, "diabolic" torture sometimes may not cause such an injury. *Id.* At the same time, the Court has added a limiting principle to this conclusion by differentiating an *injury* from the *force* that causes it. *See Wilkins*, 559 U.S. at 38. Although the Eighth Amendment can reach minor injuries caused by significant force, the Court explained, the amendment simply does not apply to "*de minimis* uses of physical force" so long as this force does not repulse "the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (citation omitted).

B

Johnson's Eighth Amendment claim flunks these standards. The magistrate judge's opinion—which the district court adopted in a short order—rejected that claim under the "objective" element by holding that Sootsman used only *de minimis* force. *Johnson*, 2022 WL 9806957, at *5. But we think it easiest to resolve Johnson's claim under the subjective element by holding that Sootsman did not maliciously and sadistically inflict harm.

*Objective Element.* Before we get to Sootsman's subjective intent, though, we start with the magistrate judge's reliance on the objective element. It is debatable whether Sootsman's force rose to a level that could be called "cruel and unusual" even under the relaxed standards that the Supreme Court follows in this use-of-force context. *See Hudson*, 503 U.S. at 9–10. This element did not require Sootsman to have inflicted a "significant injury" on Johnson, but it did require Sootsman to have used more than "*de minimis*" force against him. *Id.*

What divides actionable force from *de minimis* force? A few examples from both sides of this line help illuminate the murky border between the two. The Supreme Court has found actionable force when officers repeatedly punched and kicked a prisoner, causing him to suffer minor bruises and swelling, loosened teeth, and a cracked dental plate. *See id.* at 4, 10; *see also Wilkins*, 559 U.S. at 35, 38. We have likewise found actionable force when an officer rammed a handcuffed inmate headfirst into a concrete wall, putting a large gash in his forehead and requiring an immediate hospital visit. *See Cordell v. McKinney*, 759 F.3d 573, 577–79, 585–86 (6th Cir. 2014); *see also, e.g.*, *United States v. Budd*, 496 F.3d 517, 531–32 (6th Cir. 2007); *Carlton v. Turner*, 2006 WL 955886, at *1 (6th Cir. Apr. 12, 2006). We have also found actionable force when an officer slammed a steel door on a prisoner, *Hardy v. Vieta*, 174 F. App'x 923, 926 (6th Cir. 2006), or sprayed an inmate with a chemical agent, *see Roberson v. Torres*, 770 F.3d 398, 400 (6th Cir. 2014); *Williams*, 631 F.3d at 384. And we have found that actions violated the Eighth Amendment even when officers did not use any force. So we held that a prisoner could pursue an Eighth Amendment claim when she alleged that an officer sexually abused her without making physical contact. *See Rafferty v. Trumbull County*, 915 F.3d 1087, 1095–96 (6th Cir. 2019). And we held that a prisoner could pursue such a claim when he

alleged that an officer repeatedly threatened to kill him, once while brandishing a knife.  *See Small v. Brock*, 963 F.3d 539, 541 (6th Cir. 2020).

Conversely, the Supreme Court has suggested that a malevolent "'push or shove' that causes no discernible injury" will fall short of the force required to violate the Eighth Amendment.  *Wilkins*, 559 U.S. at 38 (citation omitted).  Similarly, we have held that an officer used *de minimis* force when he landed a "karate chop" on the "back" of a prisoner's "neck" but did not harm the prisoner.  *Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008).  We have also held that an officer used *de minimis* force when he "grabbed [a prisoner's] neck and threatened him" without causing a "physical injury[.]"  *Scott v. Churchill*, 2000 WL 519148, at *3 (6th Cir. Apr. 6, 2000) (order).  And we have held that officers used *de minimis* force when they harmed a prisoner's wrists by handcuffing him too tightly, *see Jones v. Johnson*, 2021 WL 1578185, at *2 (6th Cir. Apr. 21, 2021) (order), and when they strip searched a prisoner, *see Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011).  *See also, e.g.*, *Johnson v. Unknown Coolman*, 102 F. App'x 460, 461 (6th Cir. 2004) (order); *Jackson v. Pitcher*, 1992 WL 133041, at *1 (6th Cir. June 16, 1992) (order).

The amount of force that Sootsman used likely falls somewhere in between these two precedential poles.  On the one hand, Sootsman did not repeatedly kick or punch Johnson (like the officers in *Hudson*) or ram Johnson headfirst into a wall with such momentum as to require an urgent trip to the hospital (like the officer in *Cordell*).  Sootsman instead pushed Johnson back against a wall by the neck (allegedly choking him in the process) for about two seconds and then pulled Johnson to the ground in another five seconds.  At first blush, this force resembles the "karate chop" that we held did not suffice in *Leary*, 528 F.3d at 443, or the "grabb[ing] [of the prisoner's] neck" that we held did not suffice in *Scott*, 2000 WL 519148, at *3.  And the average person who watched the video of this encounter would not likely describe Sootsman's brief actions as "repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 10 (citation omitted).

On the other hand, *Leary* and *Scott* both included a disclaimer: they held that the conduct in these cases did not rise above *de minimis* force in part because it did not cause "any objectively verifiable injury" to the prisoner.  *Leary*, 528 F.3d at 443; *see Scott*, 2000 WL 519148, at *3.  The magistrate judge here similarly suggested that Johnson lacked any

"admissible evidence" that Sootsman's actions caused a "discernible injury[.]" *Johnson*, 2022 WL 9806957, at *6. The judge described Johnson's testimony that he had sought medical care right after the encounter as "self-serving." *Id.* She next noted that Johnson's medical treatment for his neck and wrist pain occurred in March 2021—over a year after the February 2020 encounter and several months after he sued. *Id.* The judge found this treatment too far removed to allow a jury to find it connected to Sootsman's actions. *Id.* In addition, Johnson admitted that his wrist pain could have arisen from an earlier incarceration when he was put in an "emergency restraint chair," which caused his wrists to swell and bleed. *Id.*; Johnson Dep., R.45-3, PageID 180, 183. And Johnson noted that any wrist injury would have arisen when Deputy Einhardt— not Sootsman—grabbed his arm and put it behind his back to handcuff him. *See* Johnson Dep., R.45-3, PageID 176.

If Johnson lacked proof that Sootsman caused any "verifiable injury," this case may well be analogous to *Leary*. 528 F.3d at 443. But the magistrate judge failed to take the facts in the light most favorable to Johnson. *See Griffin*, 604 F.3d at 953. Most notably, the judge wrongly relied on the "self-serving" nature of Johnson's testimony to reject his claim that he sought immediate medical care. This "self-serving" label does not provide a valid basis to ignore evidence. *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 841–42 (6th Cir. 2021). Perhaps the judge meant that Johnson's testimony was too conclusory to create a genuine issue of material fact on this point, *see id.* at 842, but even Sootsman conceded that Johnson's grievance form requested medical aid, Sootsman Dep., R.45-5, PageID 220. Unlike his wrist pain, moreover, Johnson also testified that he had never had neck pain before this encounter. Johnson Dep., R.45-3, PageID 176. So the record may well have permitted a reasonable jury to find that Sootsman's use of force caused Johnson to suffer minor neck pain for which he later sought physical therapy. And that fact might distinguish cases like *Leary* or *Scott* that found force *de minimis* because it indisputably caused no injury. In the end, though, we will leave it for future cases to clarify the scope of this objective element because Johnson cannot satisfy the subjective one.

*Subjective Element*. Johnson's Eighth Amendment claim required him also to prove that Sootsman used the force "maliciously and sadistically" to inflict pain. *Hudson*, 503 U.S. at 7. To decide whether a jury could find that an officer acted with this malicious intent, the Supreme

Court has identified several factors to consider: What was the extent of the prisoner's injury? What was the nature of the threat that justified the use of force? Was the amount of force proportional to the threat? And did the officer take any actions designed to reduce the required amount of force? *See id.*; *Whitley*, 475 U.S. at 321. More generally, we have added that, while judges may review an encounter by slowing down, pausing, and replaying a video, officers have no such luxury. They must make quick decisions in the heat of the moment. So we defer to their decisions and avoid "unreasonable *post hoc* judicial second-guessing" of their conduct. *Lockett v. Suardini*, 526 F.3d 866, 875 (6th Cir. 2008) (citation omitted); *see also Griffin*, 604 F.3d at 954.

As applied here, the Supreme Court's factors show that Johnson lacks sufficient evidence to prove Sootsman's malevolent intent. *First*, although the Eighth Amendment does not require a prisoner to suffer a "serious injury," the "absence" of such an injury goes a long way to disprove any claim that an officer used force with the required intent to harm. *Hudson*, 503 U.S. at 7–8. We have thus denied a prisoner's Eighth Amendment claim when an officer's use of force caused the prisoner to suffer "only some tenderness, bruising, and slight swelling," *Bullocks v. Hale*, 2021 WL 1578198, at *2 (6th Cir. Mar. 1, 2021) (order), or "minor lacerations and cuts," *Lockett*, 526 F.3d at 876; *see also Richmond v. Settles*, 450 F. App'x 448, 453–54 (6th Cir. 2011). Similar logic applies here. Johnson's evidence shows, at most, that Sootsman caused "minor injuries." *Lockett*, 526 F.3d at 876. For example, the investigator who reviewed Sootsman's conduct noted at the time that Johnson had "no visible injuries" and complained only "of discomfort in his throat[.]" Rep., R.51-3, PageID 606. Johnson's neck pain started to improve, so he thought his neck would "heal by itself." Johnson Dep., R.45-3, PageID 180. When he finally received medical care (over a year later), he admitted that his doctors diagnosed his pain as a "few tight places they want to work on" with physical therapy. *Id.*, PageID 176. "That's about it." *Id.*

*Second*, Sootsman had a "plausible basis" to believe that Johnson constituted a threat who needed to be restrained under all the circumstances. *Whitley*, 475 U.S. at 323. Consider what Sootsman knew before Johnson entered the hallway. Johnson had disobeyed orders during his prior incarcerations and was "always . . . trying to be intimidating." Sootsman Dep., R.45-5, PageID 213–14. Sootsman also had just seen Johnson cause a scene in the intake area. Johnson

"had been engaged in a loud, lengthy, and animated" argument over Deputy Miller's request that he remove a towel from his head. *Griffin*, 604 F.3d at 955. Johnson became so "frustrated" that he threw his lunch. Sootsman Dep., R.45-5, PageID 211–12. Given Johnson's combative conduct, the jail's policies required Deputy Einhardt to handcuff him before moving him to his general-population cell. Einhardt Dep., R.45-6, PageID 242. But Einhardt violated the policies by allowing Johnson to walk to his cell unrestrained (and she later received "counseling" for this violation). *Id.*, PageID 242–43. Sootsman likewise knew that Johnson "should have been handcuffed" before he left the intake area. Sootsman Dep., R.45-5, PageID 218.

Next consider what Sootsman knew when Johnson entered the hallway. The hallway video proves that Johnson continued to be disruptive. For example, it shows the two inmates who accompanied Sootsman turning around to look at Johnson, leaving no doubt that he was the one causing a commotion. And it shows Johnson gesticulating and his lips moving as he goes past them. By quickly walking out of the intake area, moreover, Johnson had put distance between himself and the deputies who were supposed to have control of him. He then appeared to ignore Einhardt's orders to slow down. Einhardt Dep., R.45-6, PageID 235–36. Sootsman, who was already in the hallway, heard her orders. Sootsman Dep., R.45-5, PageID 214–15.

Also consider what Sootsman knew when he spoke with Johnson. Sootsman was confronting an unhandcuffed inmate who had just disobeyed a colleague's order. Sootsman also had two other unhandcuffed inmates in the hallway, adding to the risks. The video next reveals that Johnson took a step (admittedly, a slow one) in the general direction of Sootsman and the general-population area during their conversation. Video E3, R.54, at 0:53. Sootsman saw "no reason" for Johnson to move toward him because Sootsman had not ended their conversation. Sootsman Dep., R.45-5, PageID 224. Sootsman testified that he perceived Johnson's step "as a threat" and in response used force to restrain (and handcuff) him. *Id.*, PageID 217. Even if, "in retrospect," a jury rejected Sootsman's testimony as not credible, or found "unreasonable" his belief that Johnson was a threat, the totality of the circumstances would not permit a reasonable jury to draw the more demanding inference that Sootsman used force for no other reason than to inflict pain or injure him. *Whitley*, 475 U.S. at 319, 324.

*Third*, the video of the encounter illustrates that Sootsman used an amount of force proportional "to the need for forcibly bringing [Johnson] under control." *Lockett*, 526 F.3d at 876. Our caselaw has found a similar level of force proportional when it involved, for example, "[s]hoving" or "grabbing" a prisoner to gain control of him, *id.*; *see also, e.g.*, *Begley v. Tyree*, 2018 WL 3244508, at *3 (6th Cir. Feb. 13, 2018) (order), pushing and holding a prisoner against a wall to handcuff him, *Brooks v. Fed. Bureau of Prisons*, 1999 WL 427179, at *2 (6th Cir. June 15, 1999) (order), or using a "leg-sweep maneuver" to take a prisoner to the ground so that she could be handcuffed and returned to her cell, *Griffin*, 604 F.3d at 954–56. Similarly, we have repeatedly described the use of a taser or pepper spray as a proportional level of force in response to a prisoner's refusal to follow orders, including an order to accompany an officer, *Sams v. Quinn*, 2017 WL 4574497, at *2 (6th Cir. Sept. 7, 2017) (order), and an order to "exit the shower," *Jennings v. Mitchell*, 93 F. App'x 723, 5725 (6th Cir. 2004). *See also, e.g.*, *Alexander v. Ojala*, 2018 WL 5905588, at *3 (6th Cir. May 29, 2018) (order); *Caldwell v. Moore*, 968 F.2d 595, 601–02 (6th Cir. 1992). Sootsman used a similar level of force—an amount designed to gain control of Johnson and handcuff him. He pushed Johnson against the wall with his right arm (and, under Johnson's view, squeezed his neck) for about two seconds and then pulled Johnson to the ground in order to handcuff him in about five seconds.

*Fourth*, and finally, that Sootsman's use of force lasted all of seven seconds shows that Sootsman "temper[ed] the severity" of the force. *Whitley*, 475 U.S. at 321. The video discloses that he did not land any blows that could be described as extraneous to the goal of gaining control of Johnson. All told, every reasonable jury would conclude that Sootsman could have "plausibly" believed that his use of force was necessary. *Griffin*, 604 F.3d at 954 (quoting *Whitley*, 475 U.S. at 321). So no reasonable jury could find that Sootsman's actions arose from a sadistic intent to inflict pain on Johnson rather than a (perhaps mistaken) belief of the need to restrain him.

C

In response, Johnson fails to identify evidence that would allow a reasonable jury to find that Sootsman harbored the required intent. He initially describes as an "absurdity" the magistrate judge's conclusion that the video shows him remaining agitated in the hallway.

Appellant's Br. 21.  Johnson cites Einhardt's deposition testimony that "he was done yelling" when he left intake and asserts that nothing in the video (which lacked sound) "blatantly contradicted" this testimony.  Einhardt Dep., R.45-6, PageID 234; *Scott v. Harris*, 550 U.S. 372, 380 (2007).  But he ignores the video evidence showing both his lips moving *and* Sootsman and his two detainees stopping and turning around to look behind them in the hallway.  Only one conclusion can be drawn from this footage: Sootsman continued to cause a commotion.  In all events, Einhardt's testimony separately confirmed what the video shows—that Johnson disobeyed her orders by walking quickly away, forcing her to move at almost a "jogging pace" to keep up with him.  Einhardt Dep., R.45-6, PageID 235.  So his improper conduct undisputedly continued into the hallway.

Johnson thus turns to the testimonies of Deputies Einhardt, Harris, and Miller.  Because they saw "no reason" for Sootsman's use of force, Johnson argues that a reasonable jury could find that he acted for malicious and sadistic reasons.  Appellant's Br. 23–24 (quoting Rep., R.51-3, PageID 600).  Yet Johnson provides no record citation at which these deputies state they even saw Johnson take the visible-on-the-video step that triggered Sootsman's force.  So they do not opine on whether Sootsman could have viewed that step as threatening.  And while Johnson responds that the video shows the step to have been slow and just as much in the direction of the general-population area as Sootsman, he does not claim that Sootsman authorized him to walk away.

In the end, perhaps the other deputies' testimony and Johnson's arguments about the nature of his step suggest that Sootsman acted in an "unreasonable" manner by using "unnecessary" force to restrain Johnson.  *Whitley*, 475 U.S. at 319.  But that inference falls short of what is needed.  The negligent use of force—even the reckless use of force—does not establish an Eighth Amendment claim; Johnson must prove the malicious use of force for the exclusive purpose to inflict pain.  *See id.* at 320–21.  To put things in perspective, this demanding intent element exceeds the "deliberate indifference" test that the Supreme Court requires for other types of Eighth Amendment claims.  *See Hudson*, 503 U.S. at 5–7.  And that deliberate-indifference test is itself demanding, requiring prison officials to have acted with the "subjective recklessness" that could render them liable under "the criminal law[.]"  *Farmer v. Brennan*, 511 U.S. 825, 839 (1994).

Johnson also points to the factual dispute over what was said between him and Sootsman before the use of force.  Sootsman claims that Johnson argued with him in a threatening manner, while Johnson claims that he meekly said "I am" in response to Sootsman's demand to look Sootsman in the eyes.  Johnson also claims that Sootsman was screaming at him and using offensive language.  And the video shows Sootsman shaking his finger at Johnson.  Although we must resolve this factual dispute in Johnson's favor, it does not change things.  In *Griffin*, for example, we accepted the prisoner's claim that the correctional officer said that "she was going to live in his hell" and that she "was his bitch" before he used a leg-sweep maneuver that ended up breaking her tibia.  604 F.3d at 955.  But we held that this version of the conversation did not matter given the undisputed video evidence that the prisoner was "struggling" with the officer before the use of force.  *Id.*  Similarly, in *Alexander*, we held that a prisoner did not satisfy the subjective component of his Eighth Amendment claim when an officer used his taser on the prisoner to break up a fight.  2018 WL 5905588, at *3.  That was so even though the officer told the prisoner that he had "been waiting to get your ass" after using the taser.  *Id.* at *1.  This logic applies here too.  The video undisputedly shows that Johnson stepped toward Sootsman before he pushed Johnson against the wall.  So Sootsman used "limited" force "to preserve internal order" after Johnson had repeatedly violated the officers' instructions.  *Id.* at *3.

Although Johnson equates the facts of his case with those of *Cordell*, that decision undercuts his Eighth Amendment claim.  The inmate in *Cordell* could not have plausibly posed a threat because he was handcuffed and in a submission hold.  759 F.3d at 583.  Johnson was neither.  The officer in *Cordell* also used the plaintiff "as a human battering ram" by slamming him headfirst into a concrete wall.  *Id.* at 582.  This action is not one to gain "control" of a prisoner.  Sootsman, by contrast, took that type of action.  And the plaintiff in *Cordell* suffered "sever[e]" injuries that required an immediate hospital visit, shifted his vertebrae, and led to a diagnosis of chronic pain syndrome.  *Id.* at 582–83.  Johnson's purported injuries of headaches and neck pain (and diagnosis a year later of tightness in the neck) are not on the same level.

Finally, Johnson stresses that Sootsman violated the jail's use-of-force policy and pleaded guilty to a misdemeanor battery.  These factors cannot save his claim.  As for the policy violation, a sheriff's department may "choose to hold its officers to a higher standard than that required by the Constitution[.]"  *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992); *see*

*Burwell v. City of Lansing*, 7 F.4th 456, 471 (6th Cir. 2021). As for the battery conviction, Johnson does not dispute the magistrate judge's conclusion that he forfeited any attempt to invoke issue preclusion. *See Johnson*, 2022 WL 9806957, at *4. And he did not even tell us the elements of this offense until his reply brief—a point in time that "comes too late." *Bannister v. Knox Cnty. Bd of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022); Reply Br. 2–3. Even under Johnson's view of Michigan law, Sootsman's conviction meant that he admitted only that he did not "honestly and *reasonably*" believe that his force was necessary. Reply Br. 3 (emphasis added) (quoting Mich. Crim. J. Inst. 7.22). So Sootsman's "unreasonable" belief about the need for the force might have sufficed for a conviction under this criminal law. *Whitley*, 475 U.S. at 319. But that belief falls well short of showing that Sootsman used force "maliciously and sadistically for the very purpose of causing harm." *Id.* at 320–21 (citation omitted).

\* \* \*

One should not misunderstand our holding. A conclusion that Sootsman's conduct did not violate the Eighth Amendment as a matter of neutral constitutional interpretation says nothing about whether his conduct was proper as a matter of good policy. Just because the Constitution does not bar certain actions does not make those actions right. The Constitution instead leaves this policy question to Michigan, which may regulate its correctional officers in the way that it thinks best through its prison rules or tort laws. So nothing we say here affects whether Johnson may pursue the tort claim against Sootsman that the district court left for state court. Our holding only means that federal judges are not free to turn the Eighth Amendment into a "font of tort law" by imposing their own views about the optimal balance between protecting the liberty of a state's prisoners and ensuring the security of its prisons. *Leary*, 528 F.3d at 445 (citation omitted).

We affirm.